**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma
Katrina Carroll
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
Email: jdepalma@litedepalma.com
        kcarroll@litedepalma.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GERALD J. KLEIN, on behalf of himself and all similarly situated, | ) Civil Action No. |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **CLASS ACTION** |
| TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC., AND FREDRIC TOMCZYK | ) **COMPLAINT FOR** |
| | ) **VIOLATIONS OF** |
| | ) **FEDERAL SECURITIES** |
| | ) **LAWS** |
| Defendants, | ) |

1.     Plaintiff Gerald J. Klein ("Plaintiff") residing at 113 Ricky Lane, Lakewood, New Jersey 08701, alleges, upon information and belief based upon, *inter alia*, the investigation made by his attorneys, except as to those allegations that pertain to the Plaintiff himself, which are alleged upon knowledge, as follows:

2.     Plaintiff asserts this action for breach of fiduciary duties on behalf of himself and all similarly-situated customers of TD Ameritrade Holding

1

Corporation and TD Ameritrade, Inc. ("TD Ameritrade" or the "Company"), a wholly owned subsidiary of TD Ameritrade Holding Corporation, as well as TD Ameritrade's Chief Executive Officer ("CEO") Fredric Tomczyk, in connection with self-interested routing of the Company's clients' orders to venues which paid the maximum liquidity rebate and/or paid for order flow, irrespective of whether such routing would optimize execution quality.

3.     From 2011 through the date hereof, TD Ameritrade acted as, among other things, a broker for its clients, routing their orders to various venues for execution.

4.     Brokers have various venues at their disposal to which orders can be routed.   Such venues include exchanges, regional exchanges, electronic communications networks ("ECNs"), and third market makers (*i.e.* dealers that buy and sell orders even if there is not a buyer or seller immediately available for the other side of a transaction).  A broker may also fill an order with its own inventory, a process known as "internalization," though TD Ameritrade does not engage in this practice.

5.     Brokers engaged in routing orders for their clients are under a duty of "best execution."   That is, brokers have a responsibility to execute orders in a matter that is most beneficial to their clients, and are prohibited from taking actions

2

which are not in their clients' best interests.  This duty requires that brokers fill the clients' orders to the extent possible at the best price available.

6.      At all times relevant to this complaint, TD Ameritrade was bound by a duty of best execution.

7.      At all times relevant to this complaint, TD Ameritrade acted as a broker, engaged in routing its client's orders to different venues to be executed. One such type of order, known as a "limit order," is an instruction from the client for the broker to deal in a security at a specified price above or below the current prevailing "ask" or "offer" quote.  Because limit orders contrast with so-called "market orders," or instructions to conduct transactions at the best available price, they are considered "nonmarketable."

8.      Rather than route its clients' non-directed, non-marketable orders to the venue(s) which would provide the best execution, TD Ameritrade instead sent such orders to the venues which would provide the highest liquidity rebates, payments made by the venues to TD Ameritrade relating to the number and size of orders that were routed.

9.      Rather than route its clients' non-directed, marketable orders to the venue(s) which would provide the best execution, TD Ameritrade instead sent such orders to the venues which would pay the Company for order flow, payments made

3

by the venues to TD Ameritrade relating to the number and size of marketable orders that were routed.

10.     As a result of this self-interested order routing, TD Ameritrade failed to provide best execution for its clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, or filled at a suboptimal price.

11.     Plaintiff hereby seeks to recover on behalf of himself and all similarly-situated clients of TD Ameritrade the value he lost on account of the self-interested practice of order routing described herein.

## JURISDICTION AND VENUE

12.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

13.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District.

436693.1

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## THE PARTIES

16.     Plaintiff Gerald J. Klein is a client of TD Ameritrade and has been continuously since 2011.   Plaintiff Klein is an individual and a resident of the state of New Jersey.  As detailed in his Certification, Plaintiff Klein purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

17.     TD Ameritrade Holding Corporation, with its principal place of business at 200 South 108th Avenue Omaha, NE 68154, is the parent company and sole equity holder of TD Ameritrade, Inc.

18.     TD Ameritrade, Inc., with its principal place of business at 200 South 108th Avenue Omaha, NE 68154, is a financial services company which acts as a broker-dealer, and is engaged in the trading of, among other things, stocks and bonds for itself and its over six million clients.  TD Ameritrade has more than $375 billion in client accounts and executes an average of 400,000 trades per day.  It is the third largest discount brokerage.

436693.1

19.     Fredric Tomczyk is a resident of Michigan, and is the Chief Executive Officer of TD Ameritrade.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Payment for Order Flow and Liquidity Rebates*

20.     Broker-dealers are financial services firms that buy and sell stocks, bonds, and other assets both for their clients and their own accounts.

21.     Certain broker-dealers hold shares of securities in their own inventory in order to create a market for both buyers and sellers of those securities.  These broker-dealers, who risk the adverse effects of deleterious fluctuations in the prices of those securities in exchange for the benefit of creating a market for the securities, are known as "market makers."

22.     Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker.  In order to grow a guaranteed supply of liquidity in their markets, market makers began offering payments to not only the intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their orders to the market makers.  This practice, which expanded from off-exchange securities (over-the-counter or "OTC" securities) to exchange-traded securities, came to be known as "payment for order flow."  Over time, different types of venues, including ECNs and exchanges, also began making payments for order flow.

6

23.    Market makers traditionally profited off this system by realizing the "spread" on the underlying security; that is, by buying at the "bid" price and selling at the "ask" or "offer" price.

24.    When payment for order flow first evolved, markets operated on a fraction-based system, whereby the smallest possible spread was 1/8 of a "point" (or dollar), equivalent to 12.5 cents.  Over time certain markets, such as the New York Stock Exchange ("NYSE"), adopted a narrower fractional spread of 1/16 of a point, equivalent to 6.25 cents.  In late 2000, the NYSE began a five-month test program, in which it listed 159 stocks at price increments of a penny.  On January 29, 2001, the NYSE converted all of the approximately 3,500 stocks it listed to this decimal-based system.  The "NASDAQ" (historically, the National Association of Securities Dealers Automated Quotations) exchange followed suit in March 2001, and by or on April 9, 2001—the deadline imposed by the Securities and Exchange Commission ("SEC")—all U.S. stock markets converted to a decimal-based system.

25.    The narrowing of spreads that could be realized on venues in a decimal system, coupled with the impact of automated exchange systems and other technological innovations which lowered transactions costs and further drove down spreads, meant that dealers could no longer realize the profits they once had

through the "dealer's turn," or the practice of buying at the bid price and selling at the offer.

26.    As a result of these tightened spreads, many venues adopted a "maker-taker model" to provide an incentive for brokers with non-marketable orders—*i.e.*, orders priced at or below the prevailing marketable rate, such that the order could not be filled absent movement in the price of the security—to list such orders.  This model, developed by the Island ECN in 1997, compensates brokers who "make" the market, or add liquidity, by listing non-marketable orders.  On the other hand, the venue chargers a fee to brokers who "take" liquidity by matching a marketable order with an existing bid or offer at the order price.  The liquidity fee charged to the "takers" typically exceeds the liquidity rebate credited to the "makers," and the venue pockets the difference.

27.    TD Ameritrade, in its capacity as a broker, receives payment for order flow from market-makers to which the Company routes its client's orders.

28.    TD Ameritrade also routes orders to venues that have adopted the maker-taker model, and in exchange for providing liquidity to the venues in the form of, *inter alia*, nonmarketable limit orders, the Company receives liquidity rebates.

436693.1

### *TD Ameritrade's Duty of Best Execution*

29.     Broker-dealers have a duty to seek the best execution of their customers' orders.  This duty derives from the duty of loyalty established in common law principles of agency, pursuant to which an agent is obligated to act in the best interests of the agent's principal at all times.  In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

30.     When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best venue and/or best market maker.  A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement" — the execution of a trade at a price better than the best current public quote.

31.     TD Ameritrade acknowledges that it owes its clients a duty of best execution.  On the "Frequently Asked Questions" portion of its website relating to "Order Execution," TD Ameritrade acknowledges that "[b]rokers are obligated to seek the best execution under current market conditions for their clients' orders.

They must regularly and rigorously evaluate the orders they receive to determine which markets, market makers, or Electronic Communication Networks (ECNs) offer the most favorable terms of execution.  Order-routing practices should then be modified based on this information."

32.     In a press release issued on June 12, 2014, TD Ameritrade claims that it "employs sophisticated order routing technology and processes to help it meet its obligations to seek best execution for client orders."  This sentiment was echoed by Fred Tomczyk, the president and chief executive officer of TD Ameritrade, in a quote recited within that press release:

> "There exist today comprehensive regulations and oversight, disclosure and industry competition, as well as the many checks and balances we have implemented over the years, to ensure that we remain focused on satisfying our obligation to seek best execution on behalf of our clients. Without their trust and satisfaction we wouldn't have a business, and we could not maintain either of them if we didn't deliver on our promises to the best of our abilities."

33.     Mr. Tomczyk has repeated this sentiment in other venues.  By way of example, following publication of *Flash Boys* by Michael Lewis, which called attention to, among other things, potential problems posed by brokers receiving payment for order flow, Mr. Tomczyk asserted the following during TD Ameritrade's March Quarter Earnings Results call:

> "After, and only after seeking best execution, we turn our focus to how we optimize where our flow is routed in order to maximize revenue opportunities or lower transaction costs. Some of those opportunities come in the form of payment for order flow. The

10

payments we receive from some market participants do not interfere with our efforts to seek quality execution and optimize the value proposition for our clients. Payment or no payment, best execution is our number-one priority. We believe that our approach is the most efficient, effective way for us to deliver on our best-execution responsibilities and our value proposition for retail investors."

34.     The Company's most recent 10-K, filed with the SEC on November 22, 2013, also repeatedly represents that TD Ameritrade satisfies its duty of best execution.   The 10-K claims, among other things, that TD Ameritrade's "technological capabilities and systems are central to our business and are critical to our goal of providing the best execution at the best value to our clients."

35.     TD Ameritrade makes similar representations to its institutional investors.  For example, TD Ameritrade Institutional, a Division of TD Ameritrade, Inc., makes the following representations concerning best execution on its website:

We use proprietary order execution strategies to help get the best pricing for clients. This can potentially maximize the value of portfolios and helps you meet your fiduciary responsibility.

Our strategy uses a sophisticated order router to get client orders filled completely as quickly as possible at the best price reasonably available. By combining the speed of our proprietary routing technology and our order routing intelligence, our strategies seek to fill orders fast and at the best possible price. Our strategy is aggressive in driving competitive pricing among market centers. And our strategy does not internalize - all orders are sent out to the marketplace.

TD Ameritrade is obligated to seek the best price available for your order, taking into consideration the cost of execution and current market conditions, such as the [National Best Bid and Offer], volume and liquidity. Price improvement is not guaranteed and will not occur in all situations. TD Ameritrade acts as agent. Orders are filled by independent third parties.

11

36.     Most recently, on June 17, 2014, in a prepared statement tendered to the United States Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations' Hearing on Conflicts of Interest, Investor Loss of Confidence and High Speed Trading in the U.S. Stock Markets (the "Hearing"), Steven Quirk, Senior Vice President of the Trader Group of TD Ameritrade, testified that "A broker's duty of best execution is well established. When handling customer orders, brokers are required to seek the most favorable terms reasonably available under the circumstances. We consider many factors in making this assessment, including, the opportunity to obtain a better price than currently quoted, the speed of execution and the likelihood of execution."

37.     Indeed, the TD Ameritrade client agreement expressly provides that the Company will provide Best Execution for its clients absent instructions to the contrary:

> **Order Routing and Executions.**  Unless I specify the market for execution, you decide where to route my orders for execution. You consider a wide variety of factors in determining where to direct my orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market. If I instruct you to route my order to a particular market for execution ("Direct Routing"), and you accept my order and instruction, you are not required to make a best execution determination beyond executing the order promptly and in accordance with the terms of my order. Instructions to direct my order to certain market centers could incur additional fees.

436693.1

38.    NASD Rule 2320 provided that TD Ameritrade, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" TD Ameritrade.

39.    FINRA Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

40.    Had TD Ameritrade not promised and contracted to provide best execution of its clients' orders, Plaintiff would have placed orders through a broker-dealer who did promise to provide best execution.

13

### *TD Ameritrade's Order Routing*

41.     From 2011 through the date of this Complaint, it has been TD Ameritrade's practice to route its clients' orders to the venues which pay the highest rebate for the addition of liquidity and/or most for order flow.

42.     Since January 30, 2001, the SEC has required, under Rule 11Ac1-6 (now Rule 606), that broker-dealers that route customer orders in equity and option securities make public quarterly reports that identify the venues to which customer orders are routed for execution.  These reports must also disclose the rebate that a broker-dealer receives for adding liquidity to the venue.  SEC Rule 606 exempts broker-dealers from identifying execution venues that receive less than 5% of non-directed orders, provided that 90% of non-directed orders are identified.

43.     In the fourth quarter of 2010, according to TD Ameritrade's Rule 606 Report, the Company routed 62% of limit orders to Citadel Execution Services and 22% of such orders to Citigroup.  Both of these venues paid, on average, less than 15 mills per share, where a mill is equal to one-tenth of a penny.  That same quarter, the Company routed 8% of limit orders to Direct Edge, a venue that paid 32 mills.  Thus, at that time, TD Ameritrade routed 84% or more of its limit orders to venues that paid less than half of the highest liquidity rebate available.

44.     Prior to 2011, executives at TD Ameritrade were aware that routing orders to venues that paid for order flow of marketable orders and/or offered

14

liquidity rebates for nonmarketable orders would not lead to best execution. By way of example and not limitation, on September 10, 2009, Chris Nagy—who at the time was TD Ameritrade's managing director of order routing strategy, sales, and strategy—opposed the maker-taker model, claiming that placing orders on maker-taker exchanges results in "a higher cost to retail investors and typically there's no better pricing." Less than two weeks later Mr. Nagy also observed that TD Ameritrade "felt [maker-taker] would become deleterious to the retail investor if allowed to proliferate."

45.     Sensing an opportunity for additional profit, however, TD Ameritrade radically modified its routing behavior beginning in 2011, and began routing limit orders to the venues that would maximize their rebates.  By the fourth quarter of 2012, TD Ameritrade was directing all of its nonmarketable limit orders to Direct Edge, which was paying the highest rebate for adding liquidity available at the time.

46.     At the same time, TD Ameritrade actively routed marketable orders— *i.e.*, orders to immediately buy or sell at the best available price—to market makers who paid the Company for order flow.  By way of example and not limitation, in the third quarter of 2013, TD Ameritrade routed approximately two-thirds of marketable equity orders to Citadel Execution Services ("Citadel") and one-third of marketable equity orders to Citigroup, both of whom paid 2 mills per share of

order flow to TD Ameritrade.  Had TD Ameritrade routed these market orders to an exchange employing a maker-taker model, they would have had to pay a fee for subtracting liquidity from the exchange.

47.    TD Ameritrade's most recent 606 Report demonstrates that the Company's practice of routing orders to the venues which pay the most for order flow or the highest rebates for the addition of liquidity has continued, and will likely continue, unabated.  TD Ameritrade routed over 90% of limit orders across NYSE Euronext, the NASDAQ OMX Group, and the NYSE MKT or Regional Exchanges to just three venues: Citi Global Markets ("Citi"), Citadel, and Direct Edge.  Citi and Citadel paid 18 mills and 22 mills, respectively, per share of order flow.  Direct Edge, to which TD Ameritrade routed roughly half of its clients' limit orders in the first quarter of 2014, paid a staggering 35 mills per share (or 35 cents per hundred shares traded) in liquidity rebates.

48.    With respect to market orders, TD Ameritrade routed precisely 0% of these liquidity-taking orders to Direct Edge, which would have charged TD Ameritrade a fee for depletion of liquidity.  Instead, the Company routed its market orders to market-makers and other venues which paid TD Ameritrade for the order flow.  Indeed, market-makers are prohibited from receiving payments from routing brokers by the Financial Industry Regulatory Authority ("FINRA").

436693.1

49.     TD Ameritrade similarly routes exchange listed option orders to a number of venues that pay for order flow, at an average price of 43 cents per contract.

50.     TD Ameritrade Clearing, Inc. followed the same practices in the first quarter of 2014.  It routed more than half of its limit orders to Direct Edge and LavaFlow, Inc., which paid as much as 35 mills per share in liquidity rebates, while routing none of its market orders to these venues, as it would have had to pay for taking liquidity.

51.     All told, TD Ameritrade Holding Corporation "earned" routing revenue of $236 million in 2013, $184 million in 2012, and $185 million in 2011, in the form of liquidity rebates and payments for order flow.  These amounts are in addition to the commissions which TD Ameritrade's clients paid the Company for its broker-dealer services.

52.     The foregoing was confirmed by Mr. Quirk in his testimony at the June 17, 2014 Hearing.  Specifically, Senator Carl Levin asked whether TD Ameritrade sends marketable orders, which would incur a fee if sent to an exchange, to a wholesaler broker-dealer(s), as well as whether TD Ameritrade receives payment for routing order flow to the broker-dealer(s).  In both instances, Mr. Quirk answered in the affirmative.  Sen. Levin further asked whether TD Ameritrade sends nonmarketable orders to exchanges, for which the Company is

paid rebates, and Mr. Quirk again answered in the affirmative.  Finally, Sen. Levin asked Mr. Quirk whether TD Ameritrade receives payment for order flow or liquidity rebates on nearly every trade that is completed, to which Mr. Quirk replied "[n]early, yes."  Mr. Quirk confirmed Sen. Levin's follow-up inquiry, *viz*: whether TD Ameritrade receives two payments on nearly every trade: both a commission, and a payment from the venue.

53.   Mr. Quirk asserted that TD Ameritrade has a "best execution committee" "that would make [the] decision" as to whether the trades the Company conducts satisfy TD Ameritrade's duty of best execution.  When Sen. Levin put the question to Mr. Quirk whether different brokers can reach different conclusions concerning which venue would provide best execution for both market orders and limit orders, Mr. Quirk replied in the affirmative, and elaborated that "what's going to drive the decision as to what's the best execution, and what I mean by that is, if a retail client puts in a market order, they're telling us they want a quick, timely execution at a better—at the current price or better, in its entirety."  Mr. Quirk went on to explain that "[if] it's a limit order, they're telling you they want that order to be visible.  They've picked a price.  They've determined where they're interested in purchasing that stock, and they want it to be visible."

54.     Mr. Quirk confirmed that the size of a rebate offered by a change is a factor in determining where TD Ameritrade routes orders, but claimed that this is only a consideration after all other factors are considered by the Company.

55.     Nevertheless, Mr. Quirk confirmed that, in the final quarter of 2012, TD Ameritrade had routed all of its nonmarketable limit orders to Direct Edge, and claimed that the Company's decision to route the orders to Direct Edge rather than the NYSE was because the former offered best execution in all instances that quarter.  Thomas W. Farley, the President of NYSE Group who was present at the hearing, denied that this was the case.

56.     Finally, Sen. Levin asked Mr. Quirk about limit order routing in the first quarter of 2014.  Specifically, Sen. Levin asked whether TD Ameritrade routed all limit orders to Direct Edge and LavaFlow, Inc., the exchanges that paid the highest liquidity rebates.  Mr. Quirk confirmed that this was the case.  This line of questioning led to the following exchange:

> SEN LEVIN: So, again, your subjective judgment as to which market provided best execution for tens of millions of customer orders virtually always led you to route orders to the markets that paid you the most?
>
> MR: QUIRK:  No, not always led us...
>
> SEN LEVIN: I said 'virtually always.'
>
> MR: QUIRK:  Virtually, yeah.

### *By Preferencing Venues that Paid for Order Flow and Issued Liquidity Rebates, TD Ameritrade Failed to Satisfy its Duty to Provide Best Execution for its Clients*

57.    Despite TD Ameritrade's contention that it is able to provide best execution even when it pursues a strategy of routing client orders to venues which offer the highest liquidity rebates and pay for order flow, this strategy in fact does not provide TD Ameritrade's clients with best execution.

58.    A study released in May 2012 by Woodbine Associates, Inc. ("Woodbine"), a financial consulting firm, found that liquidity rebates are costing investors as much as $5 billion *per annum*.  Woodbine's analysts limited their study to only marketable limit orders, but nevertheless found that orders on venues that paid higher liquidity rebates were executed at prices inferior to orders on venues with lesser/no rebates.  This study indicated that brokers who pursue the maximum rebate when routing marketable limit orders achieve execution inferior to that which would be achieved by seeking lesser liquidity rebates.

59.    A recent study by Robert Battalio, *et al.*[1] performed a multivariate analysis on proprietary order data obtained from a major broker-dealer's smart order routing system from October and November 2012.  The study concluded that displayed limit orders on venues offering higher liquidity rebates filled slower and less often than similar orders on venues offering lower liquidity rebates.  The

---

[1] Battalio, R., Corwin, S., and Jennings, R.  *Can Brokers Have it All?  On the Relation between Make-Take-Fees and Limit Order Execution Quality.* (pending) (the "Battalio Study").

authors determined that this analysis evidenced that a policy of routing orders to venues offering higher liquidity rebates does not offer best execution.

60.    The Battalio Study compared pairs of identical limit orders posted on different venues, measuring the time it took each order to fill, as well as the extent to which the order filled, from the time that the pair of orders first co-existed.  This aspect of the Battalio Study similarly found that venue offering lower liquidity rebates was more likely to fill the limit order, and—in instances where both venues filled the order—was far more likely to fill the order more quickly.  Again, the authors wrote that the data indicated "the decision to route all limit orders to a single venue paying the maximum rebate (and, correspondingly, charging the maximum take fee) is inconsistent with a broker's responsibility to obtain best execution."

61.    In addition to the findings based on proprietary data described above, the Battalio Study also analyzed data from the NYSE's TAQ database.  This analysis showed that realized spreads, which the authors note provide an estimate of the gross revenue earned by liquidity providers, are greater at venues that post lower liquidity rebates.  Specifically, the data showed that limit orders on the BX, a venue paying a rebate of 14 mills to liquidity takers (*i.e.*, a venue *charging a fee* to liquidity providers), realized a spread of $.0065.  Contrarily, those limit orders on the three venues charging the highest permissible take fee (and, correspondingly,

436693.1

offering the highest liquidity rebate), realized spreads between -$.0035 and -$.006. Put simply, these data indicated that a policy of routing orders to venues offering higher liquidity rebates does not offer best execution.

62.     Notably, nonmarketable limit orders on EDGX (Direct Edge's maker-taker venue, to which TD Ameritrade routed all of its nonmarketable limit orders in the fourth quarter of 2012) realized the lowest possible spread, indicating that they also realized the lowest gross revenue of any of the limit orders listed on all of the venues that were part of the analysis.

63.     The Battalio Study also analyzed limit order execution across multiple venues when each of the venues was at the inside quote (*i.e.*, the best price at which to consummate a transaction across competing market centers).  The authors found that the data supported previous academic work finding that fees influenced the routing of marketable orders to venues charging the lowest taker fee (or, it follows, in the case of *taker-maker* venues, the highest taker rebate) for removing liquidity.  In such instances, depth on the venues offering the highest taker fee (and correspondingly, the highest liquidity rebate) was two to three times as great as that on the venues charging the lowest fee/lowest liquidity rebate.  Consequently, limit orders routed to the venues paying the greatest rebates to liquidity providers take longer to be filled than limit orders on the venues paying the least rebates to liquidity providers.

436693.1

64.     Finally, the authors of the Battalio Study performed a multivariate analysis of the at-the-quote data, and found once again that realized spreads for limit orders are inversely related to maker rebates/taker fees.  The authors found that this is the case irrespective of whether all venues are at the inside quote, and after controlling for stock characteristics and market conditions.

65.     The Battalio Study authors conclude that their results indicate an impact of limit order routing decisions on some measures of limit order execution quality, such that "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution.  There is a significant opportunity cost associated with routing all nonmarketable limit orders to a single venue offering the highest liquidity rebates."

66.     The Battalio Study adds to a growing body of empirical support demonstrating that brokers who pursue a strategy of routing to venues which pay the highest liquidity rebates do so at the expense of achieving best execution for their clients.

67.     At all times relevant to the Complaint, TD Ameritrade had access to its own proprietary data, and regularly convened a "best execution committee."

68.     In spite of the foregoing, TD Ameritrade pursued a practice of routing nonmarketable limit orders to venues that pay the highest liquidity rebates, thereby

23

failing to provide best execution for its clients who placed non-directed, nonmarketable limit orders.

69.    TD Ameritrade did not pass along the liquidity rebates it received on nonmarketable limit orders to the clients who placed the orders.  Instead, the Company pocketed these liquidity rebates for itself.

70.    TD Ameritrade did not pass along the payment for order flow it received on market orders to the clients who placed the orders.  Instead, the Company pocketed these payments for order flow for itself.

71.    Despite TD Ameritrade's representation that payment for order flow "is used to offset the costs of doing business and ultimately helps to reduce the overall cost to our clients," the Company did not reduce its commission rates during the time period relevant to the Complaint, despite the increase in receipts of liquidity rebates.

## CLASS DEFINITION AND ALLEGATIONS

72.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiff brings this action on behalf of himself and all members of the following class comprised of:

**All clients of TD Ameritrade during the Class Period who placed orders in connection with which TD Ameritrade**

24

**received either liquidity rebates or payment for order flow
(the "Class"). Excluded from the Class are the officers,
directors, and employees of TD Ameritrade. Also excluded
are the judge to whom this case is assigned and any member
of the judge's immediate family.**

73.     Plaintiff reserves the right to modify or amend the definitions of the

Class after they have had an opportunity to conduct discovery.

74.     *Numerosity.   Rule 23(a)(1).*   The members of the Class are so

numerous that their individual joinder is impracticable.  Defendant has over seven

million client accounts.  Plaintiff is informed and believes that the proposed Class

contains at least hundreds of thousands of Defendant's clients who have been

damaged by the Company's conduct as alleged herein.  Record owners and other

members of the Class may be identified from records maintained by TD

Ameritrade and may be notified of the pendency of this action by mail, using the

form of notice similar to that customarily used in securities class actions.

75.     *Existence of Common Questions of Law and Fact.   Rule 23(a)(2).*

This action involves common questions of law and fact, which include, but are not

limited to, the following:

> whether  the statements made by Defendants as part of their promises to
> provide,  and assertions that they do provide, best execution of their
> clients' orders, discussed herein are true, or are reasonably likely to
> deceive, given the omissions of material fact described above;

- whether the federal securities laws were violated by Defendants' acts as
  alleged herein;

- whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period misrepresented material facts about the business, operations and management of Defendants;

- Whether Defendants' conduct constitutes a breach of fiduciary duties and/or the duty of best execution;

- Whether Plaintiff and the other members of Class are entitled to damages; and

- Whether Plaintiff and the Class are entitled to injunctive relief, restitution, or other equitable relief and/or other relief as may be proper.

76. *Typicality*. *Rule 23(a)(3)*. All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants received liquidity rebates and payment for order flow during the relevant time period, all members of the Class were subjected to the same wrongful conduct. Plaintiff's claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

77. *Adequacy. Rule 23(a)(4)*. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to

26

prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

78.  *Injunctive and Declaratory Relief.  Rule 23(b)(2).*  Defendants' actions regarding the deceptions and omissions relating to its routing of client orders are uniform as to members of the Class.  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

79.  *Predominance and Superiority of Class Action.   Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

- Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

- It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

- When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

- A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

436693.1

- A class action regarding the issues in this case does not create any problems of manageability;

- Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

- By pursuing a uniform course of conduct of routing its' clients orders to venues that would pay TD Ameritrade the most money, Defendants failed to provide best execution as a matter of policy and practice to all members of the Class; and

- As a result of Defendant's order routing policy, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

80.     Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein.

81.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

28

82.     During the Class Period, Defendants' senior managers engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive Defendants' clients, including Plaintiff and other Class members, as alleged herein; (ii) cause the Class members to engage in a broker-client relationship with Defendants which they otherwise would not have done; (iii) cause the Class members to place orders with Defendants which they otherwise would not have placed; and (iv) deprive the Class members of the best execution of their orders. Furthermore, Defendants knew that by failing to provide them with best execution of their orders, each member of the Class would, and did, incur economic harm arising from their orders being routed to inferior venues. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants' senior managers took the actions set forth herein.

83.     Pursuant to the above plan, scheme, conspiracy and course of conduct,

436693.1

Defendants' senior managers participated directly or indirectly in the preparation and/or issuance of 606 Reports, testimony, press releases, and other statements and documents described above, including statements made to government entities, securities analysts, and the media that were designed to convince the public, in general, and Defendants' clients, in particular, that Defendants were providing best execution of their clients' orders when, in fact, they were not. Such 606 Reports, testimony, press releases and other statements and documents were materially false and misleading in that they failed to disclose material information concerning Defendants' order routing practices and misrepresented the truth about same.

84.    Defendants' senior managers had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants' officers, directors, and employees acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Defendants' senior managers were committed willfully or with reckless disregard for the truth. In addition, each of Defendants' senior managers knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

436693.1

85.    Information showing that Defendants' senior managers acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. The senior managers of TD Ameritrade had knowledge of the details of TD Ameritrade's order routing strategies and behavior.

86.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants' senior managers were able to and did, directly or indirectly, control the content of the statements of TD Ameritrade. Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's routing of its clients' orders. As a result of the dissemination of the aforementioned 606 Reports, testimony, press releases, and other statements, the Class members placed orders through TD Ameritrade with an expectation of best execution throughout the Class Period. In ignorance of the adverse facts concerning Defendants' failure to provide best execution, which were concealed by Defendants' senior managers, Plaintiff and the other members of the Class placed orders through TD Ameritrade and relied upon the 606 Reports, testimony, press releases, and other statements disseminated by Defendants' senior managers, and were damaged thereby.

87.    By reason of the conduct alleged herein, Defendants, through their senior managers, knowingly or recklessly, directly or indirectly, have violated

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with Defendants' routing of their orders during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against Defendant Tomczyk**

89.     Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein.

90.     This Count is asserted against Defendant Tomczyk and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) *et seq*.

91.     During the class period, Defendant Tomczyk participated in the operation and management of TD Ameritrade, and conducted and participated, directly and indirectly, in the conduct of TD Ameritrade's business affairs. By virtue of his position as CEO, Defendant Tomczyk knew that TD Ameritrade was pursuing a policy of routing orders in order to maximize payment for order flow and the receipt of liquidity rebates at the expense of achieving best execution of its clients' orders.

92.     As CEO of TD Ameritrade, Defendant Tomczyk was in a position of control and authority, and had a duty to ensure that the employees of the Company routed the Company's clients' trades in a manner that comported with duty of best

436693.1

execution owed to its clients. Throughout the class period, Defendant Tomczyk instead exercised his power and authority to cause TD Ameritrade to engage in the wrongful acts complained of herein. Defedant Tomczyk was a "controlling person" of TD Ameritrade within the meaning of Section 20(a) of the Exchange Act, and in this capacity he participated in the wrongful conduct alleged herein, which brought hundreds of millions of dollars of revenue to the Company at the expense of its cleints.

93.     By reason of the above conduct, Defendant Tomczyk is liable pursuant to Section 20(a) of the Exchange Act for TD Ameritrade's violation of the duty of best execution which it owed to its clients.

### COUNT III
### Breach of Fiduciary Duty
### Against All Defendants

94.     Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein.

95.     The Defendants owed Plaintiff and the Class members fiduciary duties, including the duty of best execution.

96.     Defendants breached their fiduciary duties by self-interestedly routing the Class members' orders to venues in order to maximize liquidity rebates and payment for order flow, thereby failing to provide best execution.

436693.1

97.     As a result of Defendants' actions, Plaintiff and the Class members have been and damaged.

98.     Plaintiff and the Class members have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests entry of an order as follows:

A. Awarding damages against the Defendants in favor of the Class as a result of Defendants' breaches of fiduciary duties, plus pre-judgment and post-judgment interest thereon;

B. Directing TD Ameritrade to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its clients from recurrences of the damaging events described herein;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

D. Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

436693.1

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: September 15, 2014          **LITE DEPALMA GREENBERG, LLC**

By: */s/ Joseph J. DePalma*
Joseph J. DePalma
Katrina Carroll
Two Gateway Center, 12th Floor
Newark, NJ 07102
(t) (973) 623-3000
(f) (973) 623-0858

**LEVI & KORSINSKY LLP**
Eduard Korsinsky
Nancy A. Kulesa
Christopher J. Kupka
Sebastian Tonatore
30 Broad Street, 24th Floor
New York, NY 10004
(t) 212-363-7500
(f) 866-367-6510

*Attorneys for Plaintiff*

436693.1

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is not related to any other action.  Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: September 15, 2014      **LITE DEPALMA GREENBERG, LLC**

By:    *<u>/s/ Joseph J. DePalma</u>*
Joseph J. DePalma
Two Gateway Center, Ssuite 1201
Newark, New Jersey   07102
(973) 623-3000

***Attorneys for Plaintiff***

436693.1