**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| GERALD J. KLEIN, on behalf of himself and all similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 8:14-cv-00396-JFB-TDT ) |
| TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE, INC., AND FREDRIC TOMCZYK | ) ) ) ) |
| Defendants. | ) ) ) ) |

<u>**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE PUTATIVE CLASS ACTION COMPLAINT
AND REQUEST TO TAKE JUDICIAL NOTICE**</u>

KUTAK ROCK LLP
1650 Farnam Street
The Omaha Building
Omaha, Nebraska 68102-2186
(402) 346-6000

*Of counsel*:

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Attorneys for Defendants
TD Ameritrade Holding Corporation,
TD Ameritrade, Inc., and
Fredric Tomczyk*

## <u>TABLE OF CONTENTS</u>

**Page**

I. OVERVIEW .................................................................................................................1

II. COMMON BACKGROUND ......................................................................................2

      A.     *Flash Boys* ..........................................................................................................2

      B.     SEC Regulatory Oversight Of Broker Obligations To Seek Best Execution .........3

      C.     SEC Regulatory Oversight Of Payment For Order Flow .......................................6

      D.     June 17, 2014 U.S. Senate Committee Hearing......................................................8

III. THIS ACTION............................................................................................................10

      A.     The Parties .............................................................................................................10

      B.     Plaintiffs' Allegations ...........................................................................................11

IV. ARGUMENT ..............................................................................................................13

      A.     The Standard Of Review .......................................................................................16

      B.     Plaintiffs Fail To State A Section 10(b) Claim Against TD Ameritrade Or Mr. Tomczyk...........................................................................................................18

            1.     Plaintiffs Fail Adequately To Allege An Actionable Misstatement Or Omission ...........................................................................................19

                  a.     Plaintiffs Do Not Assert Any Particularized Allegations That  TD Ameritrade Failed To Satisfy Its Obligation To Seek Best Execution ....................................................................19

                  b.     TD Ameritrade's Receipt Of Payment For Order Flow  Or Rebates Is Not Inconsistent With Its Best Execution Obligations ................................................................................21

                  c.     The Senate Testimony Of The President Of NYSE Group Does Not Support The Allegation Of A Misstatement .................23

                  d.     Generic Industry Studies Do Not Support Plaintiffs' Claim .........24

            2.     Plaintiffs Fail Adequately To Allege Scienter...........................................25

            3.     Plaintiffs Fail Adequately To Allege Reliance .........................................29

i

4.      Plaintiffs Fail Adequately To Plead Loss Causation Or Economic
        Loss ...................................................................................................30

C.      Plaintiffs Fail To State A  Section 20(a) Claim Against Mr. Tomczyk................31

D.      Plaintiffs' Breach Of Fiduciary Duty Claim Is Preempted by SLUSA ................31

        1.      Plaintiffs' Allegations Satisfy
                SLUSA's "Covered Class Action" Definition ............................................34

        2.      Plaintiffs' Breach Of Fiduciary Duty Claim Is Based On State Law ........35

        3.      Plaintiffs' Claims Are Based Upon Allegations That Involve In
                Substance Misrepresentations Or Omissions,
                Or A Manipulative Or Deceptive Device ...................................................35

                a.      Plaintiffs' Allegations Involve In Substance
                        Misrepresentations Or Omissions ..................................................36

                b.      Plaintiffs' Allegations Involve In Substance A
                        Manipulative Or Deceptive Device ................................................39

        4.      Plaintiffs Allege That TD Ameritrade's And Mr. Tomczyk's
                Conduct Was  In Connection With The Purchase Or Sale Of
                Covered Securities ...................................................................................39

E.      Plaintiffs' Breach Of Fiduciary Duty Claim Is Preempted By Federal
        Regulations ...................................................................................................40

        1.      State Law Claims That Conflict With The Purpose And Objectives
                Of The Federal Regulatory Framework Are Preempted...........................41

        2.      Order Flow Payments And Order Execution Are The Subject Of
                Extensive Federal Regulation ..................................................................43

        3.      Plaintiffs' State Law Claims Conflict With The Federal Regulatory
                Framework. ..............................................................................................45

F.      Plaintiffs Fail Adequately To Plead A Breach Of Fiduciary Duty Claim ............50

V. CONCLUSION ......................................................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alpharma, Inc. v. Pennfield Oil Co.*,
   No. 8:03CV401, 2008 WL 1990783 (D. Neb. May 5, 2008) ....................................................5

*Arizona v. U.S.*,
   132 S. Ct. 2492 (2012) ...........................................................................................................41

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................16

*Atencio v. Smith Barney*,
   No. 04cv5653, 2005 WL 267556 (S.D.N.Y. Feb. 2, 2005) ...................................................40

*Atkinson v. Morgan Asset Mgt., Inc.*,
   658 F.3d 549 (6th Cir. 2011) .............................................................................................36, 38

*Barnett Bank v. Nelson*,
   517 U.S. 25 (1996) ..................................................................................................................42

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................................................................................30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................................16, 17

*Benton v. Merrill Lynch & Co., Inc.*,
   524 F.3d 866 (8th Cir. 2008) ..................................................................................................16

*Bibbo v. Dean Witter Reynolds, Inc.*,
   151 F.3d 559 (6th Cir. 1998) ..................................................................................................49

*Brehm v. Capital Growth Fin., Inc.*,
   No. 8:07CV315, 2008 WL 553238 (D. Neb. Feb. 25, 2008)...................................................33

*Brown v. Calamos*,
   664 F.3d 123 (7th Cir. 2011) ..................................................................................................36

*Buckman Co. v. Plaintiff's Legal Committee*,
   531 U.S. 341 (2001)................................................................................................................43

*Capital Cities Cable Inc. v Crisp*,
   467 U.S. 691 (1984)...........................................................................................................41, 42

*Chadbourne & Parke LLP v. Troice*,
   134 S.Ct. 1058 (2014)..............................................................................................................40

*Cornelia I. Crowell GST Trust v. Possis Medical, Inc.*,
  519 F.3d 778 (8th Cir. 2008) ..............................................................................26

*Crimm v. Missouri Pacific Railroad Co.*,
  750 F.2d 703 (8th Cir. 1984) .................................................................................5

*Crocker v. KV Pharm. Co.*,
  782 F. Supp. 2d 760 (E.D. Mo. 2010)..................................................................51

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..............................................................................................42

*CSX Transportation, Inc. v Easterwood*,
  507 U.S. 658 (1993)..............................................................................................42

*Dahl v. Charles Schwab & Co.*,
  545 N.W.2d 918 (Minn. 1996)........................................................................48, 49

*Detroit Gen. Retirement Sys. v. Medtronic, Inc.*,
  621 F.3d 800 (8th Cir. 2010).................................................................................27

*Dikeman v. Wilkinson*,
  No. CV85-L-673, 1986 WL 12801 (D. Neb. Feb. 21, 1986)...........................17, 51

*Dudek v. Prudential Secs., Inc.*,
  295 F.3d 875 (8th Cir. 2002) ...........................................................32, 34, 36, 37

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................................19, 31

*Eirman v. Olde Discount Corp.*,
  697 So.2d 865 (Fla. Ct. App. 1997) .....................................................................49

*Estate of Braunstein v. Merrill Lynch, Pierce Fenner & Smith, Inc.*,
  657 N.Y.S.2d 12 (N.Y.A.D. 1997),
  *app. dismissed*, 686 N.E.2d 1366,
  *app. denied*, 691 N.E.2d 630 (1997), *cert. denied*, 523 U.S. 1119 (1998) .............49

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982)........................................................................................41, 42

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ..........................................................29, 34, 40

*Geman v. SEC*,
  334 F.3d 1183 (10th Cir. 2003) ..........................................................................45

*Gorog v. Best Buy Co., Inc.*,
   760 F.3d 787 (8th Cir. 2014) ..........................................................................................18

*Green v. Ameritrade, Inc.*,
   279 F.3d 590 (8th Cir. 2002) ...................................................................................34, 40

*Guice v. Charles Schwab & Co.*,
   674 N.E.2d 282 (N.Y. 1996).................................................................................... passim

*Gurfein v. Ameritrade*,
   411 F.Supp.2d 416 (S.D.N.Y. 2006).................................................................................25

*Gurfein v. Ameritrade, Inc.*,
   312 F. App'x 410 (2d Cir. Feb. 27, 2009) ...................................................................21, 25

*Hillsborough Co., Fla. v. Automated Med. Labs, Inc.*,
   471 U.S. 707 (1985)..........................................................................................................43

*Horizon Asset Mgt. Inc. v. H&R Block, Inc.*,
   580 F.3d 755 (8th Cir. 2009) ............................................................................................27

*In re Application of Brenner*,
   652 N.Y.S.2d 249 (N.Y.A.D. 1996),
   *motion for leave to appeal dismissed as moot*, 90 N.Y.2d 921 (N.Y. 1997) ...........................42

*In re Ceridian Corp. Secs. Litig.*,
   542 F.3d 240 (8th Cir. 2008) ......................................................................................26, 29

*In re Cerner Corp. Sec. Litig.*,
   425 F.3d 1079 (8th Cir. 2005) ..........................................................................................27

*In re Certain Market Making Activities on NASDAQ*,
   68 S.E.C. Dkt 2693, 1998 WL 919673 (Jan. 11, 1999) .........................................................45

*In re K-tel Int'l, Inc. Sec. Litig.*,
   300 F.3d 881 (8th Cir. 2002) ..............................................................................17, 19, 29

*In re Meditronic, Inc., Sec. Litig.*,
   618 F.Supp.2d 1016 (D. Minn. 2009),
   *aff'd, Detroit Gen. Retirement Sys. v. Medronic, Inc.*, 621 F.3d 800 (8th Cir. 2010) .............28

*In re Morgan Stanley & Co., Inc.*,
   90 S.E.C. Docket 1625, 2007 WL 1364323 (May 9, 2007) ...................................................45

*In re NationsMart Corp. Secs. Litig.*,
   130 F.3d 309 (8th Cir. 1997) ............................................................................................30

*In re NVE Corp. Secs. Litig.*,
   527 F.3d 749 (8th Cir. 2008) ........................................................................19

*In re Scottrade, Inc.*,
   93 S.E.C. Dkt. 1550, 2008 WL 2510611 (June 24, 2008).....................................45

*In re: Google Inc. Gmail Litig.*,
   No. 13-MD-02430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........................10

*Int'l Paper Co. v. Ouellete*,
   479 U.S. 481 (1987)..................................................................................43

*Knights of Columbus Council 3152 v. KFS BD, Inc.*,
   280 Neb. 904 (2010) ...............................................................................50

*Krys v. Butt*,
   486 Fed.Appx. 153 (2d Cir. 2012)...............................................................52

*Kurz v. Fidelity Mgt. & Research Co.*,
   No. 07-cv-709, 2008 WL 2397582 (S.D. Ill. June 10, 2008),
   *aff'd*, 556 F.3d 639 (7th Cir. 2009)............................................................38

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ................................................................17, 27

*Kutten v. Bank of Am., N.A.*,
   530 F.3d 669 (8th Cir. 2008) ............................................................... passim

*Kutten v. Bank of Am., N.A.*,
   No: 06-0937, 2007 WL 2485001 (E.D. Mo. Aug. 29, 2007),
   *aff'd*, 530 F.3d 669 (8th Cir. 2008)............................................................32

*Levitin v. PaineWebber, Inc.*,
   159 F.3d 698 (2d Cir. 1998),
   *cert. denied*, 525 U.S. 1144 (1999)........................................................43, 49

*McDaniel v. Wells Fargo Investments, LLC*,
   717 F.3d 668 (9th Cir. 2013) .....................................................................42

*McFadden Ranch v. McFadden*,
   19 Neb. App. 366, 807 N.W.2d 785 (Neb. App. Ct. 2011). ..................................51

*McGraw v. Wachovia Secs, LLC*,
   No. 08cv2064, 2009 WL 2949290 (N.D. Iowa Sept. 10, 2009)..............................51

*McKey v. Charles Schwab & Co., Inc.*,
   67 Cal.App.4th 731 (Cal. Ct. App. 1998) ......................................................49

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71 (2006) ................................................................................................ passim

*Miller v. Redwood Toxicology Lab., Inc.*,
    688 F.3d 928 (8th Cir. 2012) ............................................................................................17

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
    641 F.3d 1023 (8th Cir. 2011) ....................................................................................19, 32

*Myers v. Merrill Lynch & Co., Inc.*,
    No. 98-3532, 1999 WL 696082 (N.D. Cal. 1999),
    *aff'd* 249 F.3d 1087 (9th Cir. 2001) ................................................................................42

*NASDAQ OMX Group, Inc. v. UBS Secs., LLC*,
    770 F.3d 1010 (2d Cir. 2014) ..........................................................................................46

*Newton v. Merrill Lynch*,
    135 F.3d 266 (3d Cir. 1998) .............................................................................................21

*Newton v. Merrill Lynch*,
    259 F.3d 154 (3d Cir. 2001) .........................................................................................5, 20

*Nixon v. Coeur D'Alene Tribe*,
    164 F.3d 1102 (8th Cir. 1999) .........................................................................................18

*Orman v. Charles Schwab & Co., Inc.*,
    688 N.E.2d 620 (Ill. 1997) ...............................................................................................49

*Pet Quarters, Inc. v. The Depository Trust & Clearing Corp.*,
    545 F.Supp.2d 845 (E.D. Ark. 2008), *aff'd*, 559 F.3d 772 ...............................................5

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
    559 F.3d (8th Cir. 2009) ................................................................................................ passim

*Pound v. Stereotaxis, Inc.*,
    8 F.Supp.3d 1157 (E.D. Mo. 2014) ..................................................................................28

*Prager v. Knight/Trimark Group, Inc.*,
    124 F. Supp. 2d 229 (D.N.J. 2000) ..................................................................................38

*Rochester Laborers Pension Fund v. Monsanto Co.*,
    883 F.Supp.2d 835 (E.D. Mo. 2012) ................................................................................26

*Schaaf v. Residential Funding Corp.*,
    517 F.3d 544 (8th Cir. 2008) ...........................................................................................31

*Securities Indus. Ass'n v Connolly*,
 883 F.2d 1114 (1st Cir. 1989),
 *cert. denied*, 495 U.S. 956 (1990) ........................................................................42

*Segal v. Fifth Third Bank, N.A.*,
 581 F.3d 305 (6th Cir. 2009) ......................................................................16, 38

*Shulick v. PaineWebber, Inc.*,
 722 A.2d 148 (Pa. 1998) ............................................................................48, 49

*Siepel v. Bank of Am.*,
 239 F.R.D. 558 (E.D.Mo. 2006),
 *aff'd*, 526 F.3d 1122 (8th Cir. 2008) ..........................................................15, 38

*Siepel v. Bank of Am., N.A.*,
 526 F.3d 1122 (8th Cir. 2008) ........................................................33, 34, 38, 40

*Silver v. H&R Block, Inc.*,
 105 F.3d 394 (8th Cir. 1997) ...............................................................................10

*Sofonia v. Principal Life Ins. Co.*,
 378 F. Supp. 2d 1124 (S.D. Iowa 2005),
 *aff'd*, 465 F.3d 873 (8th Cir. 2006) ......................................................................37

*Sofonia v. Principal Life Ins. Co.*,
 465 F.3d 873 (8th Cir. 2006) ....................................................................32, 34, 39

*Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
 295 F.R.D. 540 (S.D. Fla. 2013),
 appeal dismissed (Feb. 10, 2015) .........................................................................25

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148 (2008) .............................................................................................19

*Telco Group, Inc. v. Ameritrade, Inc.*,
 No. 8:05-cv-387, 2007 WL 203949 (D. Neb. Jan. 23, 2007),
 *aff'd*, 552 F.3d 893 (8th Cir. 2009) ......................................................5, 20, 38, 39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 127 S. Ct. 2499 (2007) .........................................................................................17

*Tellabs v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) .....................................................................................2, 17, 19

*Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*,
 No. 3:11-CV-3125-L, 2014 WL 4851558 (N.D. Tex. Sept. 30, 2014) ...................25

*U.S. v. Locke,*
    529 U.S. 89 (2000) ...................................................................................43

*Williams v. First Nat'l Bank of St. Louis,*
    No. 4:14cv01458, 2014 WL 5800199 (E.D. Mo. Nov. 7, 2014) ......................................14, 18

*Zannini v. Ameritrade Holding Corp.,*
    266 Neb. 492 (2003) ...........................................................................50

## STATUTES

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p, 78bb.................. passim

15 U.S.C. § 78b ...................................................................................................43

15 U.S.C. § 78k-1 ............................................................................................3, 44

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ................................. passim

44 U.S.C. § 1507 ....................................................................................................5

Securities Act of 1933, 15 U.S.C. § 77a et seq. .....................................................32

Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. ...........................................3, 11, 14, 44

## OTHER AUTHORITIES

U.S. Const. Art. VI, cl. 2 .....................................................................................41

17 C.F.R. § 242.600(b)(38) ...................................................................................3

17 C.F.R. § 240.10b-10(a)(2)(i)(C) (2014) ............................................... passim

17 C.F.R. § 240.10b-5 .............................................................................. passim

17 C.F.R. § 240.11ac1-3 ........................................................................................4

17 C.F.R. § 242.605 ................................................................................................8

17 C.F.R. § 242.606 .............................................................................. passim

44 Fed. Reg. 20,360 1979 WL 171078 (Mar. 22, 1979)...........................................5

58 Fed. Reg. 52,934, 1993 WL 403286 (Oct. 6, 1993) .................................................44

59 Fed. Reg. 55,006-01, 1994 WL 587790 (Nov. 2, 1994) .................................. passim

65 Fed. Reg. 75,414-01, 2000 WL 1721163 (Dec. 1, 2000) ..........................................7

71 Fed. Reg. 50,959-01, 2006 WL 3472378 (Aug. 28, 2006) .........................................................5

Fed. R. Civ. P. 12(b)(6)........................................................................................................... passim

Fed. R. Evid. 201 ....................................................................................................................17

Fed. R. Civ. P. 8 ................................................................................................................21, 51

Fed. R. Civ. P. 9(b) .....................................................................................................17, 25, 51

NASD R. 2320 ......................................................................................................................5, 20

FINRA R. 5310 .................................................................................................................. passim

Defendants TD Ameritrade Holding Corporation, TD Ameritrade, Inc. (collectively, "TD Ameritrade"), and Defendant Fredric Tomczyk respectfully submit this brief in support of their motion to dismiss the Class Action Complaint ("Complaint"), filed by Gerald Klein and pursued by plaintiffs Kwok L. Shum and Roderick Ford ("Plaintiffs").[1]   The Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

This brief and the briefs that the defendants have submitted contemporaneously in the other four related actions include several parts that are substantially the same or overlapping.  To limit, to the extent practicable, burdening the Court with duplicative portions, the defendants have organized their briefs in the five cases into three sections.  The initial section (pp. 2 to 10) sets out the common background relevant to all five related actions, and is the same in each of the five briefs.  The second section (pp. 10 to 13) provides background particular to this Complaint, and the third section (pp. 14 to 51) sets out the TD Ameritrade Defendants' arguments specific to this action.

## I. <u>OVERVIEW</u>

At its core, this Complaint, like the complaints in the other four similar actions before this Court, wages a broad attack on TD Ameritrade's receipt of compensation for routing orders to market centers for execution.  The compensation is generally called "payment for order flow" and, for certain kinds of market centers, it is called "maker rebates."  Like the others, this Complaint is built upon the unsustainable contention that, because TD Ameritrade has received or considered compensation for routing its clients' orders to various market centers, including

---

[1]   Plaintiff Gerald Klein filed the Complaint in the United States District Court for the District of New Jersey on September 15, 2014, but did not move to be appointed lead plaintiff.  Prior to the transfer of the action to this Court, the Honorable Michael A. Shipp, upon motion, approved the appointment of Plaintiffs Shum and Ford as Lead Plaintiffs and the law firm of Levi & Korsinsky LLP as Lead Counsel. (Dkt. 27 at 2.)  Plaintiffs Shum and Ford did not subsequently amend the complaint originally filed by Mr. Klein.  Therefore, Mr. Klein's complaint remains the operative complaint.

from venues that allegedly paid the most, this *must* mean that TD Ameritrade has violated its obligation to seek best execution in the routing of its clients' orders.  TD Ameritrade's best execution obligation, however, is governed by specific federal regulations that have been developed and studied over several decades by the U.S. Securities and Exchange Commission ("SEC"), and significantly, the SEC has expressly approved the practice of market centers compensating brokerage firms for order flow and rejected the notion that the consideration or receipt of such payments is a violation of best execution rules, as Plaintiffs suggest here.[2] Plaintiffs' allegations and invocation of state law seek to distract the Court from this long-established federal regulatory framework and from their Complaint's failure to state well-pled allegations of fact to support an assertion that TD Ameritrade failed *to seek* best execution.

## II. <u>COMMON BACKGROUND</u>[3]

### A.  *Flash Boys*.

The five actions before the Court were filed in the wake of the release of Michael Lewis's book *Flash Boys: A Wall Street Revolt* ("*Flash Boys*"), published on March 31, 2014.  Portions of *Flash Boys* purport to describe, in sensational terms, the trading strategies of "high frequency traders" and their intersection with obligations regarding best execution and the long-standing practice of payment for order flow,[4] both of which have been studied at length by the SEC and are the subject of extensive regulation.  *See* Parts II(B)-(C), *infra* (discussing that the SEC's careful policy balance is embodied in SEC Rule 10b-10, Rule 606 of SEC Regulation NMS, and

---

[2]     In the remainder of the brief, "payment for order flow" will include maker rebates.

[3]     This Background is drawn from (i) certain allegations of the Complaint, the truth of which is assumed for the limited purpose of this motion, (ii) documents of public record of which this Court may take judicial notice, and (iii) documents incorporated by reference into the Complaint.  *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

FINRA[5] Rule 5310 (approved by the SEC)).

Neither the Complaint nor *Flash Boys* asserts that TD Ameritrade engages in high frequency trading (the thrust of Mr. Lewis's book), or that TD Ameritrade owns or controls any high frequency trader.

**B.     SEC Regulatory Oversight Of Broker Obligations To Seek Best Execution**.

Best execution is the federal regulatory requirement that brokers seek the best execution reasonably available for their clients' orders.  TD Ameritrade is not a market-maker.  When TD Ameritrade receives a client's order to buy or sell a security, it routes that order to a market center for execution.[6]  In doing so, TD Ameritrade is subject to an extensive, federally regulated framework regarding the routing of clients' orders for execution.

The federal regulatory obligations regarding order execution arose out of the 1975 amendments to the Securities Exchange Act of 1934, U.S.C. § 78a et seq., in which Congress set forth a mandate to maintain "fair and orderly markets."[7]  Thus, over three decades, the SEC has considered, regulated and approved rules regarding best execution obligations and, in that context, has considered and articulated its position on a broker's receipt of payment for order

---

[5]        FINRA is the commonly used acronym for Financial Industry Regulatory Authority.  FINRA oversees securities brokerage firms and their registered representatives.  As part of its mandate, FINRA enacts rules and publishes guidance in its role as regulator of securities firms and brokers.  *See* http://www.finra.org/industry/oversight, last visited March 24, 2015.

[6]        Market centers include market-makers, exchanges, alternative trading systems and other venues where orders are executed. *See* 17 C.F.R. § 242.600(b)(38).

[7]        In authorizing those amendments, Congress found that it was: "in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure (i) economically efficient execution of securities transactions; (ii) fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets; (iii) the availability to brokers, dealers and investors of information with respect to quotations for transactions in securities; (iv) the practicability of brokers executing investors' orders in the best market; and (v) an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer."  15 U.S.C. § 78k-1(a)(1)(C) (2012).

flow (here, a fraction of a penny per routed share).[8]  To that end, the SEC has made or approved

pronouncements on 1) the periodic regular and rigorous review of execution quality, 2) the

permissibility of aggregating orders from all clients in evaluating execution quality, and 3)

receipt and disclosure of compensation in connection with the routing of orders.

The SEC's final rule release for Rule 10b-10 and adopting Rule 11Ac1-3, published in

1994, is directly on point.  In that release, which reviewed a series of studies and reports between

1977 and 1989 and assessed then-current market developments, the SEC identified several

factors to be taken into account by broker-dealers in connection with the routing and execution

of customer orders, including, among others, 1) price, 2) order size, 3) trading characteristics of

the security involved, and 4) the availability of accurate information affecting choices as to the

most favorable market in which execution might be sought.[9]

Obtaining the absolute best price on every order is not the standard for determining

whether a broker has met its best execution obligations.  Rather, the SEC requires that "the

broker endeavor, using due diligence, to obtain the best execution possible given all facts and

circumstances."  Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg.

55,006-01, 55,008 n.26, 1994 WL 587790, at *5 n.26 (Nov. 2, 1994).[10]  The SEC has long

---

[8]      "Payment for order flow" is broadly defined by SEC Rule 10b-10 to include any monetary
payment or other form of compensation to a broker in return for the routing of customer orders.  *See*
Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. 55,006-01, 55,008, 1994 WL
587790, at *4 (Nov. 2, 1994) (citing SEC Rule 10b-10(e)(9)).  The "maker-taker model," which involves
the payment of liquidity "rebates," is a variation on payment for order flow.  *See id.*; *further discussed*
Part II(C), *infra*.

[9]      *See* Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. at 55,008 n.26,
1994 WL 587790, at *5 n.26 (citing to Second Report on Bank Securities Activities: Comparative
Regulatory Framework Regarding Brokerage-Type Services 97-98, n.233 (Feb. 3, 1977), as reprinted in
H.R. Rep. No. 145, 95th Cong., 1st Sess. 2333 (Comm. Print 1977)).

[10]     The contents of the Federal Register shall be judicially noticed and without prejudice to any other
mode of citation, may be cited by volume and page number."  44 U.S.C. § 1507; *accord Pet Quarters,
Inc. v. The Depository Trust & Clearing Corp.*, 545 F.Supp.2d 845, 846 (E.D. Ark. 2008), *aff'd*, 559 F.3d

acknowledged the impracticality for a broker handling a heavy volume of orders to make routing determinations on an order-by-order basis, and thus allows brokers to periodically assess the execution quality of its clients' order flow in the aggregate in meeting its best execution obligations.  *See id.*; *see also* Development of a National Market System, Exchange Act Release No. 15,671, 44 Fed. Reg. 20,360, 20,366, 1979 WL 171078, at *10 (Mar. 22, 1979).[11]

The factors identified above in the SEC's 1994 final rule release were also set out in NASD Rule 2320—known as the Best Execution Rule—which was approved by the SEC in 2000, amended in 2006 and re-codified in 2012, reflecting the ongoing involvement of federal regulators in this issue.[12]  Effective May 31, 2012, the SEC approved FINRA Rule 5310 (the Rule on "Best Execution and Interpositioning"), which consolidated the best execution requirements for FINRA members (including NASD Rule 2320), and which further detailed the factors for member firms (such as TD Ameritrade) to consider when undertaking their obligation to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."  FINRA R. 5310(a) (2014).  Among the factors that "will be considered in determining whether a [broker] has used 'reasonable diligence' are: (A) the

772 (for use in motion to dismiss); *see also Crimm v. Missouri Pacific Railroad Co.*, 750 F.2d 703, 709-10 (8th Cir. 1984) (same, for use at trial); *Alpharma, Inc. v. Pennfield Oil Co.*, No. 8:03CV401, 2008 WL 1990783, at *9 (D. Neb. May 5, 2008) (Bataillon, J.) (same, for use for summary judgment).

[11]    While the SEC has recognized that a broker's compliance with best execution obligations is properly viewed in the aggregate, courts have also recognized that determining whether investors actually failed to receive best execution and suffered damage as a result requires a trade-by-trade analysis.  *See Telco Group, Inc. v. Ameritrade, Inc.*, No. 8:05-cv-387, 2007 WL 203949, at *3 (D. Neb. Jan. 23, 2007) (Bataillon, J.), *aff'd*, 552 F.3d 893 (8th Cir. 2009).  *See also Newton v. Merrill Lynch*, 259 F.3d 154, 178, 180-81 (3d Cir. 2001).

[12]    *See, e.g.*, Order Approving Proposed Rule Change to Amend NASD Rule 2320(a) Governing Best Execution, Exchange Act Release No. 34-54339, 71 Fed. Reg. 50,959-01, 2006 WL 3472378 (Aug. 28, 2006) (approving amendments to NASD Rule 2320).  Best execution was also the subject of NASD Notices to Members in 2001 and 2006.  *See NASD Notice To Members 01-22*, (April 2001); *NASD Notice to Members 06-58* (Oct. 2006).

character of the market for the security (e.g., price, volatility, relative liquidity . . .); (B) the size

and type of the transaction; (C) the number of markets checked; (D) accessibility of the

quotation; and (E) the terms and conditions of the order which result in the transaction[.]"  *Id.*

Pursuant to Rule 5310, a broker is required to have procedures in place to conduct, on a quarterly

basis, "regular and rigorous reviews of the quality of the executions of its customers' orders if it

does not conduct an order-by-order review."  *Id.* at Supplementary Material .09(a).  In

conducting this review, a broker "must determine whether any material differences in execution

quality exist among markets trading the security" by comparing factors such as price

improvement, likelihood of execution of limit orders, speed of execution, and transaction costs.

*Id.*

       C.      **SEC Regulatory Oversight Of Payment For Order Flow**.

      In its 1994 final rule release, the SEC put to rest the notion that a broker's receipt of

payment for its order flow -- in any amount -- is necessarily inconsistent with meeting its best

execution obligations, as Plaintiffs suggest here.  So long as brokers periodically assess

execution quality and seek best execution of their clients' orders taking into account the relevant

facts and circumstances, those brokers may receive payments for order flow:

> Although *it may be impractical for a broker or dealer that handles a heavy volume of orders to make an individual determination regarding where to route each order it receives*, the broker or dealer must use due diligence to seek the best execution possible *given all facts and circumstances*.  The Commission believes a broker or dealer must assess whether the order flow *in the aggregate*, is receiving best execution and that a broker-dealer must not allow a payment or an inducement for order flow to interfere with its efforts to obtain best execution. Accordingly, in light of a broker-dealer's obligation to *assess periodically the quality of the markets to which it routes packaged order flow* absent specific instructions from customers, *the Commission does not believe such a broker-dealer violates its best execution obligation merely because it receives payment for order flow*.

Payment for Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at *6 (emphasis

added).  The SEC has not wavered in this position.  *Accord id.* at *5 n. 28  (SEC "believes that bulk order routing based, in part, on the receipt of order flow is not, in and of itself, a violation of [best execution] duties."); Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 34-43590, 65 Fed. Reg. 75,414-01, 75,420, 2000 WL 1721163, at *12 (Dec. 1, 2000) (same).  In fact, the SEC has studied the practice of payment for order flow for several decades, and has considered the practice to be integral to a functioning market system.  *See, e.g.*, Payment For Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at *8 (banning payment for order flow would "represent a radical change to the industry," and concluding that disclosure is the appropriate response to the issues raised by that practice); *id.* at *6 ("payment for order flow may result in lower execution costs, facilitate technological advances in retail customer order handling practices and facilitate competition among broker-dealers and securities markets").[13]

To inform clients of the venues to which orders are routed and the payment for order flow that firms receive from individual market centers, the SEC requires particular disclosures regarding the practice.  Pursuant to SEC Rule 10b-10, a broker must disclose in client agreements, account statements and trade confirmations that payment for order flow may be received by the broker for the transaction and, upon written request by the client, must also disclose the source and nature of the compensation received in connection with the particular transaction.  17 C.F.R. § 240.10b-10(a)(2)(i)(C) (2014) (promulgated in 1977, with amendment adding specific reference to payment for order flow in 1994).  The Complaint does not allege that TD Ameritrade failed to make these required disclosures.

In addition, Rule 606 of SEC Regulation NMS requires quarterly disclosure of specified

---

[13]    *See generally, e.g.*, *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282, 286-288 (N.Y. 1996) (explaining the history of federal regulations pertaining to payment for order flow).

order routing statistics.  TD Ameritrade publishes quarterly reports in accordance with Rule 606 of SEC Regulation NMS that identify venues to which TD Ameritrade routes orders for execution.  *See* 17 C.F.R. § 242.606 (2014).  Those Rule 606 Reports also disclose, among other things, payment for order flow arrangements with those venues, including a description of the amounts per share or per order that the broker-dealer receives.  *Id.*[14]  The SEC instructs, however, that while statistics in Rule 606 Reports provide disclosures regarding certain of the factors relevant to order routing decisions, they are not of themselves determinative of a broker's efforts to seek best execution:

> The Commission wishes to make clear its views as to the limits of these data in evaluating a broker-dealer's compliance with its legal duty of best execution. Both Rule 11Ac1-5 and Rule 11Ac1-6 are designed to require disclosure pursuant to Section 11A of the Exchange Act. They are not antifraud rules, nor do they create new duties under the antifraud provisions of the federal securities laws. The rules themselves create neither express nor implied private rights of action. Furthermore, Rule 11Ac1-5 and Rule 11Ac1-6 do not address and therefore do not change the existing legal standards that govern a broker-dealer's duty of best execution. The market center reports will provide statistical disclosures regarding certain of the factors relevant to a broker-dealer's order routing decision, but these factors alone are not determinative of whether the broker-dealer achieved best execution.

Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 43,590, 2000 WL 1721163, at *11 (commenting on predecessor to SEC Rule 606).

> **D.** **June 17, 2014 U.S. Senate Committee Hearing**.

In response to *Flash Boys*, a U.S. Senate subcommittee held a hearing on June 17, 2014 regarding high speed trading as well as best execution and payment for order flow.  A number of industry participants, including Steven Quirk, an executive of TD Ameritrade, were invited to testify.  The complaints in each of the five actions rely upon and incorporate by reference

---

[14]     Under SEC Rule 605 (former Rule 11Ac1-5), the market centers to which TD Ameritrade routes orders must publicly disclose on a monthly basis, basic standardized information concerning their handling and execution of orders. *See* 17 C.F.R. § 242.605.

8

portions of Mr. Quirk's testimony, but omit significant portions.

As set forth in the publicly available transcript,[15] Mr. Quirk testified that TD Ameritrade seeks best execution of its clients' orders by, among other things, considering the factors set out in FINRA Rule 5310.  Mr. Quirk testified further that, once TD Ameritrade has satisfied itself that a particular market center meets the regulatory standards for best execution, TD Ameritrade will then consider transaction costs or revenue opportunities.  Specifically, Mr. Quirk testified in a colloquy with Senator Levin:

> Senator Levin. Is the size of the rebate offered by an exchange a factor in determining where you route nonmarketable customer orders?

> Mr. Quirk. The way that our committees and the people responsible for order routing approach this is they start with the best execution, and they would go through a list of variables that we should consider as hurdles. And in order to get to a point where the revenue sharing is even considered, those hurdles have to be cleared.

> Senator Levin. And the revenue sharing that you are talking about is the rebate?

> Mr. Quirk. Correct, sir.

> Senator Levin. When you get to that point——

> Mr. Quirk. Yes.

> Senator Levin [continuing]. After you say you have looked at the other factors, and then you look at the rebate issue, my question is: Is the size of the rebate offered by an exchange a factor in determining where you route those nonmarketable customer orders?

> Mr. Quirk. Yes. It would be the last factor. All things being equal, that would be a factor.

> Senator Levin. And so the greater the rebate, that would be where you would go if it is otherwise best market.

> Mr. Quirk. Yes.

Index of Evidence, Exhibit 1 (Declaration of Alex J. Kaplan, ("Kaplan Declaration"), Ex A at

---

[15]   *See* http://www.gpo.gov/fdsys/pkg/CHRG-113shrg89752/pdf/CHRG-113shrg89752.pdf, last visited March 24, 2015.

47.)[16]  Mr. Quirk also testified that TD Ameritrade routed orders to a variety of exchanges, and

some did not pay the highest rate, as reflected in TD Ameritrade's SEC Rule 606 Reports:

> <u>Senator Levin</u>. So, anyway, for virtually every trade, your customers you say were
> better off by your routing their orders to the exchange that paid you a rebate rather
> than a venue that TD Ameritrade would have had to have paid a fee. Is that true?
>
> <u>Mr. Quirk</u>. I would say in the subsequent 24 months, you will note in our 606s that
> we have routed to a number of exchanges in one quarter, and some of those
> exchanges would not be the exchanges which were paying the highest rate.

(*Id.* at 48.)  The complaints in each of the five actions fail to mention the SEC's admonition that

Rule 606 statistics (which identify venues to which orders are routed during a particular quarter)

are not of themselves determinative in assessing a broker's efforts to seek best execution.  *See*

*supra* Part C.  Rather, contrary to the SEC's warning, the complaints focus on portions of

testimony regarding Rule 606 statistics for select time periods, and a single type of order, and

broadly allege that TD Ameritrade does not seek best execution.

## III. <u>THIS ACTION</u>

### A.    <u>The Parties</u>.

Defendant TD Ameritrade, Inc. is the third largest discount brokerage, with more than six

---

[16]    Exhibit 1.A attached to the Index of Evidence is comprised of excerpts from the official Congressional transcript of the June 17, 2014 hearing before the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs relating to the testimony of Mr. Steven Quirk, a TD Ameritrade executive.  The Court may properly consider these excerpts on a Motion to Dismiss because (i) the Complaint embraces and relies upon Mr. Quirk's testimony (*see*, *e.g.*, Compl. ¶¶ 36, 52), and (ii) the Court may take judicial notice of these excerpts because the official transcript is a matter of public record.  *See*, *e.g.*, *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (affirming summary judgment on the "alternative ground" that "the district court could have granted [defendant's] motion to dismiss rather than convert the motion for summary judgment . . . [T]he district could have properly considered the complete statements in granting the motion dismiss," where "lawsuit is based only on the statements, and [plaintiff] does not dispute their content.  *[Plaintiff] cannot defeat a motion to dismiss by choosing not to attach the full statements to the complaint.*  In considering a motion to dismiss, courts accept the plaintiff's factual allegations as true, but *reject conclusory allegations of law and unwarranted inferences*.") (emphasis added) (citations omitted); *In re: Google Inc. Gmail Litig.*, No. 13-MD-02430, 2013 WL 5423918, at *6-7 (N.D. Cal. Sept. 26, 2013) (taking judicial notice of a public Senate hearing transcript).

million clients.  (Compl. ¶ 18.)  Defendant TD Ameritrade Holding Corporation is the parent

company and sole equity holder of TD Ameritrade, Inc.  (Compl. ¶ 17.)  Defendant Fredric

Tomczyk is the Chief Executive Officer of TD Ameritrade.  (Compl. ¶ 19.)  Lead Plaintiffs

Kwok L. Shum and Roderick Ford contend that they are TD Ameritrade clients.[17]  (Dkt. 22, Ex.

1 at 7.)

        **B.**    **Plaintiffs' Allegations**.

Plaintiffs allege that TD Ameritrade and Mr. Tomczyk violated Section 10(b) of the

Securities Exchange Act of 1934 (the "1934 Act") and breached fiduciary obligations because

they made oral and written statements that TD Ameritrade seeks to provide best execution on

client orders, even though TD Ameritrade allegedly did not do so, but rather sought to maximize

payment for order flow at the expense of best execution.  (*See*, *e.g.*, Compl. ¶¶ 2, 8, 9.)  Plaintiffs

also seek to hold TD Ameritrade's CEO Mr. Tomczyk liable as a control person of

TD Ameritrade pursuant to Section 20(a) of the 1934 Act.  (Compl. ¶¶ 89-93.)

Plaintiffs allege that "Defendants' senior managers participated directly or indirectly in

the preparation and/or issuance of 606 Reports, testimony, press releases, and other statements"

that "were materially false and misleading."  (*Id.* ¶ 83.)  The Complaint alleges that the following

statements are misrepresentations:

-     TD Ameritrade's website Frequently Asked Questions on order execution, which

describes, among other things, a broker's obligation to seek best execution (*id.* ¶ 31);

-     Statements made by Mr. Tomczyk during an earnings call on April 23, 2014 and

in a press release issued on June 12, 2014, regarding the manner in which TD Ameritrade seeks

best execution of its clients' orders (*id.* ¶¶ 32-33);

---

[17]    *See also* n. 1, *supra* (explaining that the original named plaintiff Gerald Klein did not move to be appointed lead plaintiff, and that Plaintiffs elected not to amend the complaint originally filed by Mr. Klein).

- Statements in TD Ameritrade's Form 10-K, dated November 22, 2013, regarding the manner in which TD Ameritrade seeks best execution of its clients' orders (*id.* ¶ 34);

- TD Ameritrade Institutional's website page concerning the manner in which that TD Ameritrade affiliate seeks best execution of its clients' orders (*id.* ¶ 35);

- Mr. Quirk's statements during the Senate Subcommittee hearing regarding the manner in which TD Ameritrade seeks best execution on its clients' orders (*id.* ¶ 36); and

- Section 8(a) of the Client Agreement, which states, among other things, that TD Ameritrade considers a "wide variety of factors in determining where to direct [its clients'] orders" (*id.* ¶ 37).

The Complaint contains allegations with respect to two types of non-directed[18] client orders, which Plaintiffs refer to as "marketable" and "non-marketable" limit orders. (*See, e.g.*, Compl. ¶ 7.) A limit order is an "instruction from the client for the broker to deal in a security at a specified price above or below the current prevailing 'ask' or 'offer' quote." (*Id.*) An order is "marketable" if a client instructs that it be executed at the best available price. (*Id.*) "Marketable" orders are considered to "take" liquidity from a market. (*Id.* ¶ 26.) A limit order is "non-marketable" when the specified (or more favorable) price is not yet available—*i.e.*, "orders prices at or below the prevailing marketable rate, such that the order could not be filled with the prevailing marketable rate." (*Id.*) "Non-marketable" limit orders are considered to provide or "make" liquidity in a market. (*Id.*) Plaintiffs allege that TD Ameritrade received "payment for order flow" from market makers in return for the routing of "marketable" orders.

---

[18]     Non-directed means that clients decide that their broker will choose the market center to which the orders are routed.

(*Id.* ¶¶ 9, 27.)  Plaintiffs allege that TD Ameritrade received "liquidity rebates" from "maker-taker" exchanges in return for the routing of "non-marketable" orders.  (*Id.* ¶ 28.)

Plaintiffs point to general industry studies regarding order routing payments and rebates and the purported impact on brokers' execution obligations.  (*See* Compl. ¶¶ 58-59.)  The Complaint does not allege, and these publications do not state, that they have analyzed the actual execution quality achieved by TD Ameritrade.

Plaintiffs assert that they traded millions of shares (Dkt. 22, Ex. 1 at 7), but they do not identify a single order that allegedly did not receive best execution.  Likewise, Plaintiffs do not identify any exchanges or other venues to which TD Ameritrade supposedly should have routed orders, or explain how or why those exchanges or venues would have provided materially better execution on particular trades.

Plaintiffs purport to bring this Action on behalf of themselves and a Class of "[a]ll customers of TD Ameritrade during the Class Period who placed orders in connection with which TD Ameritrade received either liquidity rebates or payment for order flow."  (Compl. ¶ 36.)

Plaintiffs seek an order "[a]warding damages against the Defendants in favor of the Class" and "[d]irecting TD Ameritrade to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its customers from recurrences of the damaging events described herein."  (Compl. at p. 34.)

## IV. ARGUMENT

The Complaint cannot stand as pled and must be dismissed for multiple, independent reasons.

As to Count I – which asserts that TD Ameritrade and Mr. Tomczyk violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder by making

misrepresentations or omissions as to best execution – Plaintiffs do not allege with the required particularity that TD Ameritrade 1) failed to seek best execution when routing client trades, 2) acted with fraudulent intent, or 3) caused losses to the Plaintiffs by reason of its alleged misrepresentations.  Nor do Plaintiffs allege that they reasonably relied on any purported misrepresentation.  Instead, Plaintiffs contend that receipt of payment for order flow, including maker rebates, is a violation of the best execution obligation.  Far from banning the payment for order flow practice, however, the SEC regulates the obligation to seek best execution as well as the receipt of payment for order flow through disclosure, and has stated repeatedly that "the receipt of payment for order flow is not, in and of itself, a violation of [best execution] duties." Plaintiffs ignore the specific federal regulatory rules and guidance regarding best execution and payment for order flow, and instead attempt to manufacture a claim based on Plaintiffs' characterization of generic industry studies, as well as Plaintiffs' inaccurate description of excerpts from TD Ameritrade statements.  Plaintiffs' allegations, however, fall well short of stringent pleading requirements under the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  15 U.S.C. § 78u-4.

Count II – which asserts that Mr. Tomczyk violated Section 20(a) of the 1934 Act – must also be dismissed as entirely derivative of Plaintiffs' Section 10(b) claim.

Count III – for breach of fiduciary duty against TD Ameritrade and Mr. Tomczyk – also fails to state a claim for several reasons:

*First*, Plaintiffs' assertion of a state la breach of fiduciary duty claim is an improper attempt to artfully avoid the PSLRA's stringent pleading requirements.  Under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. §§ 77p, 78bb, Congress has explicitly required that courts dismiss certain class actions that assert state law claims arising

14

from securities transactions.  Federal law preempts "covered class actions" based on allegations involving *either* (i) a misrepresentation or omission of material fact, *or* (ii) the use of a manipulative or deceptive device, in connection with the purchase or sale of a covered security. *See*, *e.g.*, *Siepel v. Bank of Am.*, 239 F.R.D. 558, 567 (E.D.Mo. 2006), *aff'd*, 526 F.3d 1122, 1127 (8th Cir. 2008) (dismissing Rule 10b-5 claims on the merits and common claims pursuant to SLUSA, where the "essence of the Amended Complaint is that Defendants misrepresented and omitted material facts" in connection with the purchase or sale of a security).  Significantly, when assessing whether SLUSA applies to the "allegations," the Eighth Circuit instructs that courts "not rely on the names of the causes of action that the plaintiff alleges.  Instead [courts] look at the substance of the allegations, based on a fair reading.  SLUSA preemption is based on the conduct alleged, not the words used to describe the conduct."  *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670-71 (8th Cir. 2008) (affirming dismissal of breach of fiduciary duty and other state law claims as preempted by SLUSA, and collecting Eighth Circuit authorities).  Here, Plaintiffs' breach of fiduciary duty claim relies on the same conclusory allegations that involve, in substance, assertions of misrepresentations or omissions and manipulative or deceptive devices in connection with securities transactions.  This theory of recovery is therefore covered by SLUSA and must be dismissed.

*Second*, and alternatively, Plaintiffs' breach of fiduciary duty claim is preempted because it directly conflicts with the federal regulatory framework that *expressly permits* broker-dealers to route their orders to market centers in exchange for payment, so long as they comply with federal rules on disclosure and order execution.  That regulatory framework arose out of extensive studies and commentary by the SEC, which determined – and has repeatedly reaffirmed – that a broker does not violate its best execution obligations because it receives

15

payment for order flow.  In the 1990's (before the enactment of SLUSA), many courts dismissed state law claims against broker-dealers relating to payment for order flow because they conflicted with – and thus were preempted by – this same federal regulatory framework.  For similar reasons, Plaintiffs' breach of fiduciary duty claim must also be dismissed as preempted by federal law.

*Third*, and also alternatively, Plaintiffs do not plead a breach of fiduciary duty.  As with their Section 10(b) claim, Plaintiffs do not allege that TD Ameritrade failed to seek best execution on client orders.  Moreover, while Mr. Tomczyk owes fiduciary duties to TD Ameritrade, he does not owe fiduciary duties to TD Ameritrade's *clients*.

For all of these reasons, the Complaint should be dismissed with prejudice.

## A.      The Standard Of Review.

To avoid dismissal of any claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  While, a complaint is plausible when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,"  "[a] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008) (citing *Twombly*, 540 U.S. at 570).  *See also Iqbal*, 556 U.S. 662, 678 (quoting *Twombly*, 550 U.S. at 555-57).  Although the Court must accept all *non-conclusory* factual allegations as true, a complaint must state a claim for relief that rises above the "speculative level."  *Twombly*, 550 U.S. at 555-56.

16

Further, claims that sound in fraud must satisfy the heightened pleading standards mandated by Rule 9(b), and federal securities fraud claims must meet the particularly stringent pleading standards of the PSLRA, 15 U.S.C. § 78u-4(b)(1)-(2) & (4). *See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499 (2007); *see also Dikeman v. Wilkinson*, No. CV85-L-673, 1986 WL 12801, at *2 (D. Neb. Feb. 21, 1986) (applying Rule 9(b) to breach of fiduciary duty claim sounding in fraud).

"[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. Further, "[w]hen deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc*., 317 F.3d 820, 831 (8th Cir. 2003) (internal quotation and citation omitted); *see also In re K-tel Int'l, Inc. Sec. Litig*., 300 F.3d 881, 889 (8th Cir. 2002) ("The court may consider, in addition to the pleadings, materials 'embraced by the pleadings' and materials that are part of the public record.").[19]  *See also Miller v. Redwood Toxicology Lab., Inc.,* 688 F.3d 928, 931, n.3 (8th Cir. 2012) ("While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for

---

[19]     Rule 201 of the Federal Rules of Evidence provides for judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  Rule 201 mandates that "[a] court ***shall*** take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d) (emphasis supplied).

17

summary judgment." quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).[20]

Moreover, a court must disregard allegations that are contradicted by the complaint itself or documents supporting them. *See*, *e.g.*, *Gorog v. Best Buy Co., Inc*., 760 F.3d 787, 793 (8th Cir. 2014) (affirming dismissal of claim where the plain language of document incorporated by reference into complaint foreclosed liability); *Williams v. First Nat'l Bank of St. Louis*, No. 4:14cv01458, 2014 WL 5800199, at *4 (E.D. Mo. Nov. 7, 2014) ("Courts need not accept as true 'factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice.'") (quoting *Perry v. NYSARC, Inc.*, 424 Fed. Appx. 23, 25 (2nd Cir. 2011)).

For the reasons that follow, the Complaint should be dismissed with prejudice because Plaintiffs have not stated a claim against TD Ameritrade or Mr. Tomczyk.

**B.      Plaintiffs Fail To State A Section 10(b)**
**Claim Against TD Ameritrade Or Mr. Tomczyk.**

To state a violation of Section 10(b), Plaintiffs must plead (1) a material misrepresentation or omission, (2) scienter, *i.e*., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Dura*

---

[20]      As described herein, the TD Ameritrade Defendants have attached to its Index of Evidence several documents that are embraced by Plaintiffs' Complaint or which the Court can take judicial notice of and properly consider on a Motion to Dismiss.  To the extent the Court does not believe these documents can be properly considered on a Motion to Dismiss, the TD Ameritrade Defendants respectfully request that the Court disregard these documents.  By submitting these documents, the TD Ameritrade Defendants do not intend to convert this Motion to a Motion for Summary Judgment. *See Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999)) ("In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or opposition to the motion").

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *accord Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1028 (8th Cir. 2011).

Plaintiffs bear a heavy burden in pleading these elements. "Additional pleading standards apply to securities actions, including the PSLRA's requirements that the complaint 1) 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and 2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *In re NVE Corp. Secs. Litig.*, 527 F.3d 749, 751 (8th Cir. 2008) (*quoting* 15 U.S.C. § 78u-4(b)(1) & (b)(2)). The "circumstances of the fraud must be stated with particularity, including such matters as the time, place and contents of false representations, ... [t]his means the who, what, when, where, and how." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002) (internal quotations and citations omitted). These are "[e]xacting pleading requirements." *Tellabs*, 551 U.S. at 313.

Plaintiffs' allegations fall well short of these stringent pleading requirements.

### 1.      Plaintiffs Fail Adequately To Allege An Actionable Misstatement Or Omission.

Plaintiffs allege that TD Ameritrade and Mr. Tomczyk made material misstatements and omissions concerning TD Ameritrade's obligation to seek best execution. For the following reasons, these allegations are insufficient.

#### a.      *Plaintiffs Do Not Assert Any Particularized Allegations That TD Ameritrade Failed To Satisfy Its Obligation To Seek Best Execution.*

Plaintiffs do not allege a single well-pled fact that TD Ameritrade did not, in fact, seek best execution for its clients' orders. The SEC requires brokers to satisfy this obligation by "assess[ing] periodically [in the aggregate] the quality of the markets to which it routes packaged order flow." Exchange Act Release No. 34-34902, at 11; 1994 WL 587790, at *6; *see also supra*

19

Part II(C).  While Plaintiffs allege that FINRA Rule 5310 (and its predecessor NASD Rule 2320) encompass TD Ameritrade's obligations with respect to any such "periodic assessment" (Compl. ¶¶ 38-39), Plaintiffs fail to allege – with the required particularity under the PSLRA or otherwise – that TD Ameritrade did not seek best execution as set forth in FINRA Rule 5310.

FINRA Rule 5310(a) requires TD Ameritrade to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the client is as favorable as possible under prevailing market conditions."  FINRA Rule 5310 also identifies several factors that are "considered in determining whether a member has used 'reasonable diligence,'" but Plaintiffs do not allege particularized facts that TD Ameritrade failed to consider those factors.  The Complaint lacks any allegations whatsoever that, when engaging in "reasonable diligence," TD Ameritrade did not consider "the character of the market for the security" (*e.g.*, price, volatility, and relative liquidity).  FINRA Rule 5310(a).  Likewise, the Complaint is devoid of any particularized allegations that TD Ameritrade failed to consider other FINRA Rule 5310 factors, such as "the size and type of transaction," or "the number of markets checked," or "accessibility of the quotation," or "the terms and conditions of the order which resulted in the transaction."  (*But see* Compl. ¶ 37 (acknowledging in Client Agreement that TD Ameritrade considers these factors when routing orders).)  FINRA Rule 5310 also includes Supplementary Material, which provides further guidance regarding a member's best execution obligations.  Supplementary Material .09 states, among other things, that a member must conduct a "regular and rigorous review" of execution quality.  (*Accord* Compl. ¶ 31 (same, citing to TD Ameritrade's website of Frequently Asked Questions on Order Execution).)  Far from alleging that TD Ameritrade failed to conduct a regular and rigorous review, however, Plaintiffs

20

allege that TD Ameritrade follows a multi-step strategy when routing orders and has a committee that reviews best execution. (*See, e.g.*, Compl. ¶ 53.)

Plaintiffs have also failed to identify any alternative exchange at which TD Ameritrade allegedly *should* have sought to execute their orders. Such a pleading deficiency was found fatal even under Rule 8, much less the PSLRA's heightened pleading standard. *See Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 412, 414 (2d Cir. Feb. 27, 2009) (affirming dismissal of claim against TD Ameritrade predecessor regarding alleged representation that it would route trades to "the appropriate market," where the complaint "does not appear to contain nonconclusory allegations that there was an alternative exchange that was reasonably available to Ameritrade under the circumstances and that would have offered materially better overall execution"); *cf. Newton v. Merrill Lynch,* 135 F.3d 266, 268-69 (3d Cir. 1998) (reversing dismissal of best execution claim against brokers, in 10b-5 case initiated prior to the passage of the PSLRA, where the plaintiffs alleged that the brokers were aware of specific alternative venues and had used those alternative venues to "trad[e] at [a] more favorable price for their own account").

> **b.      TD Ameritrade's Receipt Of Payment For Order Flow Or Rebates Is Not Inconsistent With Its Best Execution Obligations.**

Plaintiffs offer the broad contention that TD Ameritrade's receipt of order flow payments and liquidity rebates is *necessarily* inconsistent with seeking best execution (*see, e.g*., Compl. ¶ 66). But that conclusory contention is not actionable or supported by SEC rules and guidance regarding the receipt of such payments. For many years, the SEC has studied the intersection of best execution and the receipt of payment for order flow, and made clear that it "*does not believe [] a broker-dealer violates its best execution obligation merely because it receives payment for order flow*." Payment for Order Flow, 1994 WL 587790, at *5 n.28, *6 (SEC "believes that bulk

21

order routing based, in part, on the receipt of payment for order flow is not, in and of itself, a violation of [best execution] duties"). As a result, instead of banning the practice, the SEC has chosen to regulate payment for order flow by providing guidance and enacting or approving rules regarding a broker's best execution and disclosure obligations relating to payment for order flow and order execution. *See*, *e.g.*, *Id.* at *8 (explaining that banning payment for order flow would "represent a radical change to the industry," and concluding that disclosure is the appropriate response to the issues raised by that practice); SEC Rule 10b-10 (requiring payment for order flow disclosure in account statements and confirmations). *See also* Part II(C), *supra*. Plaintiffs nowhere allege that TD Ameritrade failed to make any required disclosures under SEC or FINRA Rules; instead, the Complaint acknowledges that TD Ameritrade made the required disclosures. (*See, e.g.*, Compl. ¶¶ 42-50 (citing TD Ameritrade's SEC Rule 606 Reports).)

Likewise, Plaintiffs' assertion that a broker has not sought best execution in instances where it may have received the most routing revenue offered is equally conclusory and not actionable. (*See, e.g.*, Compl. ¶ 68.) Indeed, the premise of Plaintiffs' theory is that the receipt of more order routing revenue from one market center over another is somehow incompatible with best execution obligations, but as explained, Plaintiffs do not allege with any particularity whatsoever that TD Ameritrade did not seek best execution on client orders, in accordance with FINRA Rule 5310 or other regulatory obligations. *See* Part IV(B)(1)(a), *supra*. Likewise, Plaintiffs also fail to allege *how or why* TD Ameritrade was supposedly unable to satisfy its best execution obligations if it also maximized revenue opportunities. Moreover, the SEC has never said that, by routing orders to a market center that pays the most for order flow, the broker dealer has failed to seek best execution. Furthermore, Plaintiffs' allegations, which derive from their review of TD Ameritrade's Rule 606 reports (*see, e.g.*, Compl. ¶ 42), ignore the SEC's directive

22

that *Rule 606 Reports are not of themselves determinative of a broker's best execution*

*obligations*:

> [W]hile the order execution and routing disclosures will represent a significant step forward in the quality of information that is currently publicly available, *they alone will not provide a reliable basis to assess a broker-dealer's compliance with its duty of best execution*. Therefore, the resulting statistics, by themselves, do not demonstrate whether or not broker-dealers have complied with their legal duties to their customers, and *to conclude otherwise would be contrary to the Commission's prior statements, discussed below, about the duty of best execution*. Furthermore, the Commission believes that the possibility of multiple, inconsistent standards in interpreting this information in relation to various state law claims could tend to frustrate the statutory objective of establishing and monitoring the development of a national market system and would undermine the Commission's effort to assure the practicability of brokers achieving best execution.

*Final Rule: Disclosure of Order Execution and Routing Practices*, 2000 WL 1721163, at *12

(explaining Rule 11Ac1-6, predecessor to SEC Rule 606) (citing *Guice v. Charles Schwab &*

*Co*., 674 N.E.2d 282 (N.Y. 1996), *cert. denied*, 520 U.S. 1118 (1997)).[21]

> c.   *The Senate Testimony Of The President Of NYSE Group Does Not Support The Allegation Of A Misstatement*.

Plaintiffs' reference to testimony by the President of NYSE Group, Thomas Farley, offers

nothing to address the Complaint's failure to plead any actionable misstatement or omission.

Plaintiffs allege that Mr. Farley "denied" that another market center to which TD Ameritrade

routed orders, Direct Edge, provided best execution in all cases during the final quarter of 2012

(Compl. ¶ 55).  The publicly available transcript shows, however, that Mr. Farley was asked only

---

[21]     Furthermore, while Plaintiffs allege that "TD Ameritrade's most recent Rule 606 Report demonstrates that" TD Ameritrade has a "practice of routing orders to the venues which pay the most for order flow or the highest rebates for the addition of liquidity" (Compl. ¶ 47), Plaintiffs allege in the *same* paragraph that TD Ameritrade routes client orders to multiple venues, including to venues that pay less than the highest rebate.  *See id.* (alleging that "TD Ameritrade's most recent 606 Report demonstrates" that TD Ameritrade routed 90% of limit orders across three major exchanges, paying $0.0018 per share (Citi), $0.0022 per share (Citadel), and $0.0035 per share (Direct Edge)); *see also* Index of Evidence Ex. 1.A at 48 (Mr. Quirk testified: "you will note in our 606s that we have routed to a number of exchanges in one quarter, and some of those exchanges would not be the exchanges which were paying the highest rate.").

whether "the New York Stock Exchange [was] just consistently *worse* than Direct Edge in

getting best execution on retail orders," to which he simply responded "no."  (Index of Evidence

Ex. 1.A at 48(emphasis added).)[22]  Mr. Farley said nothing about whether Direct Edge provided

best execution.

> d. *Generic Industry Studies Do Not Support Plaintiffs' Claim.*

Finally, no claim can be stated against TD Ameritrade or Mr. Tomczyk based on

Plaintiffs' citation to two generic industry studies: the "Woodbine study" and the "Battalio

study."[23]  Neither study supports Plaintiffs' claim.

Plaintiffs do not allege that either study (i) analyzed whether *TD Ameritrade* seeks to

provide best execution on its clients' orders; (ii) considered any actual *execution quality data*

provided *by TD Ameritrade*; or (iii) analyzed any of *Plaintiffs'* particular trades.[24]  (*See* Index of

Evidence Ex. 1.B at 2, 4 (Battalio Study).)  Thus, such generic industry data, not specific to *these*

defendants, cannot satisfy the stringent pleading requirements of the PSLRA and Rule 9(b) to

---

[22]       Exhibit 1.A attached to the Index of Evidence is comprised of excerpts from the official
Congressional transcript of the June 17, 2014 hearing before the U.S. Senate Committee on Homeland
Security and Governmental Affairs, including testimony of Thomas Farley.  The Court may take judicial
notice of Mr. Farley's testimony because (i) the Complaint embraces and relies upon Mr. Farley's
testimony (*see* Compl. ¶ 55), and (ii) the official transcript is a matter of public record.  *See* note 16,
*supra*.

[23]       *See* Exhibit 1.B attached to the Index of Evidence.  Exhibit 1.B is an excerpt from a draft study by
Robert H. Battalio et al. titled: *Can Brokers Have it All?  On the Relation Between Make Take Fees &
Limit Order Execution Quality*, March 5, 2014.  Plaintiffs refer to and quote extensively from this study
in their Complaint, *see* Complaint at ¶¶ 58-65. This exhibit is properly considered by this Court on a
Motion to Dismiss because it is embraced by the Complaint and relied upon by Plaintiffs as the basis of
certain claims against the TD Ameritrade Defendants.  *See* note 16, *supra*.

[24]       Furthermore, the "Battalio study" Plaintiffs cite states on its face that it is a *draft*, and states
further that it relies on statistics from TD Ameritrade's and other brokers' SEC Rule 606 reports (Index of
Evidence Ex. 1.B at 4), and thus ignores the SEC's directive that such statistics "*alone will not provide a
reliable basis to assess a broker-dealer's compliance with its duty of best execution*."  Final Rule, 2000
WL 1721163, at *12; *see also* Part II(C), supra (setting out SEC's admonition regarding Rule 606
statistics).

sustain a claim against TD Ameritrade. *See Gurfein*, 312 Fed.Appx. at 411-12 (affirming

dismissal of action regarding alleged failure to obtain best execution on specific trades involving

"Forrest Labs put options," and declining to credit the plaintiff's citation to an SEC report

because its "non-specific findings about orders placed through three primary direct access firms,

not including Ameritrade and not involving Forrest Labs options, are too far removed from the

trades at issue here to make claims regarding [the exchange's] handling of [plaintiff's] trades

anything more than speculative") (citing *Twombly*, 550 U.S. at 555); *Gurfein v. Ameritrade*, 411

F.Supp.2d 416, 425-26 (S.D.N.Y. 2006) (dismissing predecessor complaint asserting Section

10(b) claim for the same reasons).[25]

        As in *Gurfein*, the Court should disregard Plaintiffs' speculative allegations regarding the

theories presented in the Woodbine study and the draft Battalio study.

### 2.    Plaintiffs Fail Adequately To Allege Scienter.

        The PSLRA requires that the Complaint plead with particularity facts giving rise to a

*strong inference* that TD Ameritrade or Mr. Tomczyk *intended* to deceive Plaintiffs. *See* 15

U.S.C. § 78u–4(b)(2); *In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240, 249 (8th Cir. 2008) ("An

inference of scienter must be more than merely plausible or reasonable – it must be cogent and at

least as compelling as any opposing inference of nonfraudulent intent.") (citing *Tellabs*, 551 U.S.

---

[25]        *See also, e.g.*, *Town N. Bank, N.A. v. Shay Fin. Servs., Inc.*, No. 3:11-CV-3125-L, 2014 WL
4851558, at *22 (N.D. Tex. Sept. 30, 2014) ("While the study [at issue] addresses securities of the same
general type as those purchased by [the plaintiff], such a connection is too tenuous and insufficient for
purposes of the Rule 9(b) and the PSLRA"); *Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner
& Smith Inc.*, 295 F.R.D. 540, 549 (S.D. Fla. 2013), appeal dismissed (Feb. 10, 2015) (dismissing fraud
claim, and disregarding non-particularized allegations concerning a study, reasoning "[a]s with other
theories discussed above, [plaintiff's] claim regarding correlation of CDOs' securities relies on general
information about the CDO market as a whole and not the specific CDOs owned by [company acquired
by plaintiff]. The Federal Reserve Study, as described in the Complaint, examined mortgage-based CDOs
collectively and made no findings concerning any particular CDOs or their issuing banks. [Plaintiff] yet
again gives no factual support for its claim that the cross-referencing of mortgage securities in the broader
CDO market affected [the subject] CDO notes and their credit ratings. Thus, [plaintiff] has not plausibly
or specifically pleaded that any Defendant engaged in fraud against [company acquired by plaintiff].").

at 323).  Plaintiffs fail to satisfy this pleading requirement because they do not allege well-pled

facts (i) "demonstrating a mental state embracing intent to deceive, manipulate, or defraud"; (ii)

constituting "conduct which rises to the level of severe recklessness"; or (iii) "motive and

opportunity" to commit the alleged fraud.  *Cornelia I. Crowell GST Trust v. Possis Medical, Inc.*,

519 F.3d 778, 782 (8th Cir. 2008).

As an initial matter, the Complaint contains no allegations regarding any particular

Defendant's intent.  Rather, all allegations that Plaintiffs assert in support of their Section 10(b)

claim are directed at TD Ameritrade, unnamed "executives at TD Ameritrade," "Defendants" or

"senior managers of Defendants," (Compl. ¶¶ 44, 82-86), and the Complaint contains *no*

allegations – conclusory or otherwise – regarding Mr. Tomczyk's intent.  These allegations –

which constitute improper group pleading – cannot support a Section 10(b) claim.  *See, e.g.*,

*Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F.Supp.2d 835, 895-96 (E.D. Mo. 2012)

(granting motion to dismiss, where complaint "merely alleges 'knowledge' as a group without

any specific allegations about each defendant and each alleged misrepresentation, such as how

and what each defendant allegedly knew that rendered the alleged misstatement actionable")

(citing *Horizon Asset Mgt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (plaintiff

must "raise a strong inference of scienter for *each* defendant and with respect to *each* alleged

misrepresentation") (emphasis added)).[26]

Moreover, the failure to plead facts supporting deceitful intent on the part of any

---

[26]     For the same reason, Plaintiffs' Rule 10b-5 claim against defendant TD Ameritrade Holding
Corporation must be dismissed because the Complaint does not contain a single allegation concerning
TD Ameritrade Holding Corporation.  *Horizon,* 580 F.3d at 761.

TD Ameritrade officer responsible for disclosures means that Plaintiffs have not pled the scienter of the corporate defendants.[27]  Plaintiffs allege that "Defendants' [unidentified] senior managers knew or recklessly disregarded that material facts were being misrepresented or omitted" (Compl. ¶ 84), but this boilerplate conclusion is not supported by any cogent or compelling facts. Moreover, Plaintiffs allege that, "[p]rior to 2011, *executives at TD Ameritrade were aware* that routing orders to venues that paid for order flow of marketable orders and/or offered liquidity rebates for nonmarketable orders would not lead to best execution."  (Compl. ¶ 44) (emphasis added).  Even if Plaintiffs had pleaded – as they have not – facts showing that routing of orders to such venues would not lead to best execution (*see* Part II(A), *supra*), Plaintiffs do not specify any cogent or compelling facts that were brought to the attention of Mr. Tomczyk or any other TD Ameritrade officer by any particular source at any particular point in time.  *See Horizon*, 580 F.3d at 766-67.

Plaintiffs also assert in similarly generic terms that "TD Ameritrade had access to its own proprietary data, and regularly convened a 'best execution committee.'"  (Compl. ¶ 67.) Allegations of this sort – shorn of any specific allegation of what information was provided, when, and to whom – are routinely rejected as a basis for pleading scienter.  *See, e.g., Pound v. Stereotaxis, Inc.*, 8 F.Supp.3d 1157, 1168 (E.D. Mo. 2014) (finding "claim of individual Defendants having the requisite scienter because their corporate positions afforded them access to a wide range of information" to be "non-particularized allegations of scienter and therefore

---

[27]     *See Detroit Gen. Retirement Sys. v. Medtronic, Inc.*, 621 F.3d 800, 808-09 (8th Cir. 2010) ("[T]he complaint fails to allege any one individual or group of individuals had, or even had access to, all those pieces of information collectively at the time the allegedly misleading statements were made. . . . mere possession of uncollected data does not indicate [a corporate defendant] was aware of the implications of that data."); *See also In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085-86 (8th Cir. 2005) (rejecting claim that sales forecasts were fraudulent based on knowledge of a regional sales manager); *Kushner v. Beverly Enterprise, Inc.*, 317 F.3d 820, 827-30 (8th Cir. 2003) (holding that scienter could not be inferred from the fact that subordinate employees involved in a fraudulent scheme "reported" to one named officer).

insufficient"); *In re Meditronic, Inc., Sec. Litig.*, 618 F.Supp.2d 1016, 1034 (D. Minn. 2009) ("allegation of data monitoring" and access to data insufficient), *aff'd*, *Detroit Gen. Retirement Sys. v. Medronic, Inc.*, 621 F.3d 800, 808-09 (8th Cir. 2010).

In their only effort at specifics, Plaintiffs point to statements purportedly made by a former TD Ameritrade employee (Chris Nagy) in two articles from 2009 regarding potential transaction costs that would be borne by retail clients or brokers when trading options. Specifically, Plaintiffs allege that, "on September 10, 2009," Mr. Nagy "opposed the maker-taker model" and stated that "placing orders on maker-taker exchanges results in 'a higher costs to retail investors and typically there's no better pricing'"; Plaintiffs also allege that, "less than two weeks later," Mr. Nagy "observed" "that TD Ameritrade 'felt [maker-taker] would become deleterious to the retail investor if allowed to proliferate.'"  (Compl. ¶ 44.)  Plaintiffs do not allege, however, that Mr. Nagy stated that rebates resulted in *worse* pricing or higher costs for investors.  Moreover, according to the face of each article, Mr. Nagy commented on *the options market*, and is quoted as criticizing the *fees charged by exchanges* in connection with the "maker-taker" model as potentially impacting clients who trade options, as opposed to rebates paid to brokers.[28]

---

[28]   *See* Index of Evidence Ex. 1.C ("September 10 Article") and *id.*, 1.D ("September 21 Article"). Exhibit 1.C attached to the Index of Evidence is an article written by Alexandra Zendrian, titled *The Amex Lives Again?*, published by Forbes.com, dated September 10, 2009, available at http://www.forbes.com/2009/09/10/nyse-amex-ameritrade-markets-merrill-lynch.html.  Index of Evidence Exhibit 1.D is an article written by John Hintze, titled *Maker-Taker Fees Losing out on Options Markets; Exchanges*, published by Securities Industry News, dated September 21, 2009.  Plaintiffs refer to and quote from these articles in their Complaint, *see* Complaint at ¶ 44. These exhibits are properly considered by this Court on a Motion to Dismiss because they are embraced by the Complaint and relied upon by Plaintiffs.  *See* note 16, *supra*.  The September 10 Article states that, under the maker-taker model, the "exchanges charge the liquidity taker," whereas in the alternative "price-time priority options exchanges," "the client doesn't pay a transaction fee."  (Index of Evidence at Ex. 1.C at 1; *accord id.* at Ex. 1.D at 1 (September 21 article notes that, under the maker-taker model, "[r]etail or institutional investors, known as 'clients,' [] pay fees for 'taking' liquidity from those markets").)

Finally, Plaintiffs allege generally that TD Ameritrade had a motive to increase its profitability: "Sensing an opportunity for additional profit, however, TD Ameritrade radically modified its routing behavior beginning in 2011, and began routing limit orders to the venues that would maximize their rebates." (Compl. ¶ 45.)  This alone is "'too thin a reed on which to hang an inference of scienter.'"  *K-tel*, 300 F.3d at 894 (affirming dismissal, in part, for failure to plead scienter where complaint merely alleged a "general desire to maintain a high credit rating or make a company appear attractive to potential buyers").  While the Eighth Circuit considers motive to be a *part* of the scienter pleading inquiry, it has cautioned against accepting generic allegations of motive, standing alone, to sustain a fraud claim:

> [H]aving the motive and opportunity to do wrong are certainly not the same as having the intent to do it. . . The rule, taken literally, presumes that anyone who has the chance to profit by wrongdoing is likely to do so. This is a large leap . . . Nearly every highly ranked executive of a company could be said to have the motive and the opportunity to profit by misstatements.

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654-60 (8th Cir. 2001).  Courts thus routinely dismiss such allegations as too generalized to provide a basis to infer scienter. *See*, *e.g.*, *In re Ceridian Corp.*, 542 F.3d at 247-48 (finding allegations of insider trading and bonuses insufficient); *K-tel*, 300 F.3d at 894 ("insufficient motives" include "desire for the corporation to appear profitable" and "desire to keep stock prices high to increase officer compensation") (internal citations omitted).

### 3.        Plaintiffs Fail Adequately To Allege Reliance.

To recover under Section 10(b), Plaintiffs must also adequately plead reasonable reliance on the alleged misstatements—which Plaintiffs fail to do here.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988) ("Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."); *In re NationsMart Corp. Secs. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997) (affirming dismissal, in part, because plaintiffs failed to plead reliance, "a

29

necessary element of recovery under Rule 10b-5").  Plaintiffs make the conclusory statement that, "[h]ad TD Ameritrade not promised and contracted to provide best execution of its clients' orders, Plaintiff[s] would have placed orders through a broker-dealer who did promise to provide best execution."  (Compl. ¶ 40.)  Yet, the Complaint is completely devoid of any specific factual allegations that Plaintiffs reasonably relied on (or even read) the statements in the "606 Reports, testimony, press releases, and other statements and documents" that Plaintiffs claim were "materially false and misleading."  (Compl. ¶ 83.)  Plaintiffs merely aver that such statements were "designed to convince the public, in general, and Defendants' clients, in particular."  (*Id.*) The Complaint contains no particularized allegations that Plaintiffs received and reasonably relied on those statements to their detriment.  These generalized allegations do not sufficiently plead reliance with particularity, and, on this basis alone, this claim should be dismissed.  *See NationsMart*, 130 F.3d at 322 (affirming dismissal of Section 10(b) claim where plaintiffs "did not claim that they ever read the Prospectus or specify which allegedly fraudulent statements they relied on in purchasing NationsMart stock").[29]

### 4.     Plaintiffs Fail Adequately To Plead Loss Causation Or Economic Loss.

Plaintiffs also fail to plead the essential elements of loss causation and economic loss.  To state a claim under Section 10(b), the plaintiff must allege an injury that was proximately caused by the defendant's alleged misconduct.  *See* 15 U.S.C. § 78u-4(b)(4); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  The complaint must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," *id.* at 347, by stating well-pleaded facts showing a causal connection between the defendant's misstatements

---

[29]     Moreover, Plaintiffs do not purport to "invoke any of the presumptions of reliance." *NationsMart*, 130 F.3d at 322.

and the plaintiff's losses. *Schaaf v. Residential Funding Corp*., 517 F.3d 544, 549-50 (8th Cir. 2008) (citing *Dura*, 544 U.S. at 347).

Here, Plaintiffs fail to allege that any misrepresentations or omissions by TD Ameritrade or Mr. Tomczyk proximately caused any economic damage they purportedly incurred. While Plaintiffs contend that Defendants' purported misrepresentations "deprive[d] the Class members of the best execution of their trades" (Compl. ¶ 82), the Complaint never alleges anything about the execution of any specific trades – nothing about the speed of execution on any of their trades, or the price they received, or the fill rate. Crucially, Plaintiffs do not allege that they could have obtained better execution on even a *single trade*, or a superior venue for such execution. Thus, Plaintiffs do not allege the requisite causal link between any statement and the quality of execution they received on any trade, let alone any loss caused by revelation of any purported misrepresentations or omissions. *Dura*, 544 U.S. at 347. For this independent reason, Plaintiffs' Section 10(b) claim must be dismissed.

### C. Plaintiffs Fail To State A Section 20(a) Claim Against Mr. Tomczyk.

Because the Complaint does not plead a primary violation under Section 10(b), it does not state a Section 20(a) claim against Mr. Tomczyk. *See, e.g.*, *Minneapolis Firefighters, Relief Ass'n v. MEMC Electronic Materials, Inc*., 641 F.3d 1023, 1027, 1030 (8th Cir. 2011).

### D. Plaintiffs' Breach Of Fiduciary Duty Claim Is Preempted by SLUSA.

Where a claim is preempted, it is subject to dismissal under Rule 12(b)(6). *See, e.g., Kutten v. Bank of Am., N.A.,* No: 06-0937, 2007 WL 2485001, at *3 (E.D. Mo. Aug. 29, 2007), *aff'd*, 530 F.3d 669 (8th Cir. 2008). The state law portion of this action – Count III for breach of fiduciary duty against TD Ameritrade and Mr. Tomczyk – is preempted by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1) ("SLUSA"), and therefore must be

dismissed.  SLUSA amended the Securities Act of 1933 and the Securities Exchange Act of 1934

(the "1933 Act" and "1934 Act," respectively) to preclude an action where:

> (1) the action is a "covered class action" as defined in the Act,
>
> (2) the action purports to be based on state law,
>
> (3) the action *alleges* that defendant misrepresented or omitted a material fact (or used or employed a manipulative or deceptive device or contrivance), and
>
> (4) the action *alleges* that the defendant's misrepresentations or omissions of material fact were made "in connection with the purchase or sale of a covered security."

*Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 876 (8th Cir. 2006) (citing 15 U.S.C. §§ 77p(b)-

(c), 78bb(f)(1)-(2)) (emphasis added).

SLUSA was enacted to "prevent plaintiffs from seeking to evade the protections that

Federal [securities] law provides against abusive litigation," including the heightened pleading

standards under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Sofonia*, 465

F.3d at 876; *accord Dudek v. Prudential Secs., Inc.*, 295 F.3d 875, 877 (8th Cir. 2002) (SLUSA

remedied the unintended result of the PSLRA, which "drove many would-be plaintiffs to file

their claims in state court, based on state law, in order to circumvent the strong requirements

establish by the" PSLRA) (citation omitted).  SLUSA, together with the 1933 and 1934 Acts and

the PSLRA, demonstrates that "[t]he magnitude of the federal interest in protecting the integrity

and efficient operation of the market for nationally traded securities cannot be overstated."

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006).  "[T]he Supreme

Court instructed that SLUSA should be read with the 'presumption that Congress envisioned a

*broad construction*,' so that the most troublesome class actions would be subject to the PSLRA's

procedural reforms."  *Siepel v. Bank of Am., N.A.*, 526 F.3d 1122, 1127 (8th Cir. 2008) (quoting

*Dabit*, 547 U.S. at 86) (emphasis added); *cf. Brehm v. Capital Growth Fin., Inc.*, No.

32

8:07CV315, 2008 WL 553238, at *2 (D. Neb. Feb. 25, 2008) (Bataillon, J.) ("SLUSA is meant to be construed broadly") (citing *Dabit*).  SLUSA's breadth even "pre-empts state-law class-action claims for which federal law provides no private remedy."  *Dabit*, 547 U.S. at 74.

       The Eighth Circuit has held that, in applying SLUSA, a court "do[es] not rely on the names of the causes of action that the plaintiff alleges.  Instead [it] look[s] at the *substance* of the allegations, based on a fair reading.  SLUSA preemption is based on the conduct alleged, not the words used to describe the conduct."  *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670-71 (8th Cir. 2008) (citing earlier Eighth Circuit opinions) (emphasis added).  Thus, the Supreme Court, the Eighth Circuit and many other courts have held repeatedly that SLUSA preempts actions asserting state law claims – *including those that assert claims for breach of fiduciary duty* – when the above-listed elements are satisfied.  *See*, *e.g.*, *Dabit*, 547 U.S. at 75 (holding that SLUSA barred breach of fiduciary duty and another state law claim); *Kutten*, 530 F.3d at 670 (affirming dismissal of claim for breach of fiduciary duty as preempted by SLUSA); *Siepel*, 526 F.3d at 1124, 1127 (same); *Sofonia*, 465 F.3d at 879-80 (same); *Dudek*, 295 F.3d at 879-80 (same).[30]

       Accordingly, "the critical question is whether [the] complaint can reasonably be read as alleging a sale or purchase of a covered security made in reliance on the allegedly faulty information provided to [Plaintiffs] and to putative class members by" TD Ameritrade.  *Sofonia*, 465 F.3d at 877 (quoting *Green*, 279 F.3d at 598).  As applied here, the answer to this question is yes.  As explained further below, each of the SLUSA requirements is satisfied.

---

[30]     As explained further on p. 40 n. 35, *infra*, while the Eighth Circuit, in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002), declined to dismiss a breach of contract claim pursuant to SLUSA, the allegations in *Green* (regarding a failure to provide real-time stock price information) differed crucially from those asserted here, and the Eighth Circuit's decision turned entirely on the "in connection with" requirement, which was subsequently expanded by the Supreme Court in *Dabit*.  *Id.* at 598-99; *Siepel*, 526 F.3d at 1127 (limiting Green to the extent it is inconsistent with *Dabit*'s broad construction of "in connection with").

33

1.      **Plaintiffs' Allegations Satisfy**
        **SLUSA's "Covered Class Action" Definition**.

SLUSA defines a "covered class action" to be an action in which:

(I) damages sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individuals persons or members; *or*

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members[.]

15 U.S.C. §§ 77p(f)(2)(i)(II), 78bb(f)(5)(B)(i)(II) (emphasis added).  Thus, "[a] 'covered class action is a lawsuit in which damages are sought on behalf of more than 50 people." *Dabit*, 547 U.S. at 83.

Here, Plaintiffs allege that they bring this Action on behalf of themselves and "all customers of TD Ameritrade during the Class Period who placed orders in connection with which TD Ameritrade received either liquidity rebates or payment for order flow."  (Compl. ¶ 72.)  Plaintiffs also allege that "the proposed Class contains at least hundreds of thousands of Defendant's customers."  (*Id.* ¶ 74.)  Plaintiffs additionally allege that they seek damages on behalf of themselves and the Class.  (*Id.* ¶¶ 16, 74, 79.)  Plaintiffs further allege "[q]uestions of law or fact common to the Class predominate over any questions affecting only individual members."  (*Id.* ¶ 79.)  Accordingly, this action satisfies the "covered class action" definition under SLUSA.[31]

---

[31]      In the event the Court denies this motion, at the appropriate time, the TD Ameritrade Defendants will oppose any motion to certify a class.

2.    **Plaintiffs' Breach Of Fiduciary Duty Claim Is Based On State Law**.

SLUSA requires that the plaintiff's claims be based on state law.  *See* 15 U.S.C. §§

77p(b), 78bb(f)(1).  Here, Plaintiffs purport to assert a claim for breach of fiduciary duty based

on state law.  (*See* Compl. ¶¶ 94-98 (identifying Count III as breach of fiduciary duty against all

defendants).)  Therefore, this SLUSA requirement is satisfied.

3.    **Plaintiffs' Claims Are Based Upon Allegations That Involve In Substance Misrepresentations Or Omissions, Or A Manipulative Or Deceptive Device**.

SLUSA also requires that the plaintiff "allege" that the defendants either made a

"misrepresentation or omission of material fact," *or* "used or employed any manipulative or

deceptive device or contrivance."  15 U.S.C. §§ 77p(f)(1)(A)-(B), 78bb(f) (1)(A)-(B).  A plaintiff

need not assert a federal securities claim (although, here, Plaintiffs purport to do so); it is enough

that the complaint asserts *allegations* "that involve" in "substance" misrepresentations,

omissions or manipulative conduct, irrespective of what law plaintiff asserts is applicable.

*Dudek*, 295 F.3d at 879; *see also Kutten*, 530 F.3d at 670-71.  The Eighth Circuit rejects efforts

to avoid SLUSA merely by asserting claims whose elements do not require proof of fraud.

Dudek, 295 F.3d at 879 (rejecting plaintiffs' contention that "SLUSA does not apply to this case

because their complaint did not allege fraud or a misrepresentation or omission of material

fact").[32]  As explained below, Plaintiffs assert allegations that involve in substance

misrepresentations or omissions, as well as allegations that involve in substance a manipulative

---

[32]    To the extent that Plaintiffs seek in briefing to disclaim their allegations of misrepresentations or omissions, the "'artful' disclaimers" do not impact SLUSA's preemptive force.  *Atkinson v. Morgan Asset Mgt., Inc.*, 658 F.3d 549, 555 (6th Cir. 2011) (affirming dismissal of 13 state-law theories of recovery, including breach of contract and negligent misrepresentation, as preempted by SLUSA, reasoning that "district court rightly analyzed 'the allegations contained in the complaint,' and 'not the state-law label placed on the claim,' in concluding that 'allegations of omissions or other deceitful activity" pervaded each of Plaintiffs' claims.  *That the claims did not 'depend' on these allegations is inapposite, as is Plaintiffs' 'artful' disclaimer*") (citations omitted) (emphasis added); *accord Brown v. Calamos*, 664 F.3d 123, 130-31 (7th Cir. 2011).

or deceptive device, and those allegations – individually and collectively – satisfy this SLUSA

element.

> a.    *Plaintiffs' Allegations Involve In Substance Misrepresentations Or Omissions.*

"[B]ased on a fair reading" of "the conduct alleged" in the Complaint, Plaintiffs' theory

of recovery for breach of fiduciary duty is based upon *allegations* that involve in substance

misrepresentations or omissions.  *Kutten*, 530 F.3d at 670-71 (affirming preemption of action

asserting claim of breach of fiduciary duty under SLUSA, explaining "we do not rely on the

names of the causes of action that the plaintiff alleges").  Significantly, Plaintiffs assert three

theories of recovery – including two Counts under the federal securities law provisions

addressing misrepresentation – that are based upon *the same allegations asserted throughout the*

*Complaint*.  "[B]ecause all of Plaintiff[s'] causes of action arise from the same set of operative

facts, and because each of Plaintiff[s'] claims arises from an allegation that misrepresentations

were made in connection with the purchase of covered securities," Plaintiffs' state claim for

breach of fiduciary duty is "preempted by SLUSA."  *Sofonia v. Principal Life Ins. Co.*, 378 F.

Supp. 2d 1124, 1134 n.9 (S.D. Iowa 2005), *aff'd*, 465 F.3d 873 (8th Cir. 2006); *see also, e.g.*,

Compl. ¶¶ 80-88 (characterizing allegations as misrepresentations and omissions, and contending

that Defendants engaged in a fraudulent scheme and conspiracy).

At bottom, Plaintiffs allege that Defendants made representations about the factors

TD Ameritrade considers in routing orders to market centers, but that, in actuality, it routed

orders based on the amount of payments for order flow.  Specifically, Plaintiffs allege that they

relied on statements and disclosures by Defendants that TD Ameritrade routes orders in a manner

36

that seeks to obtain best execution.[33]  Plaintiffs contend that TD Ameritrade's practices deviated

from these representations – indeed, that is the entire point of their federal securities fraud claim.

As discussed above, Plaintiffs contend that TD Ameritrade executives were supposedly "aware"

before 2011 that routing orders to any venue that paid for order flow or provided any rebates

would not lead to best execution.  *Id.* ¶ 44.  But Plaintiffs assert that, "[i]n spite of the foregoing,

TD Ameritrade pursued a practice of routing" client orders "to venues that pay the highest" fees

to TD Ameritrade.  *Id.* ¶¶ 68.  Thus, SLUSA preempts this action because the "gravamen" of the

allegations is that Defendants misrepresented in various disclosures, the Client Agreement and

elsewhere, the way in which TD Ameritrade was making routing decisions with respect to

clients' stock orders.  *Dudek*, 295 F.3d at 879; *accord, e.g.*, *Kutten*, 530 F.3d at 670-71.

       When presented with allegations that involve in substance misrepresentations or

omissions, or a manipulative or deceptive device, courts dismiss breach of fiduciary duty claims

as preempted by SLUSA.  *See*, *e.g.*, *Dabit*, 547 U.S. at 78  (breach of fiduciary duty claim

preempted by SLUSA); *Kutten*, 530 F.3d at 670-71 (affirming dismissal of claim for breach of

fiduciary duty); *Atkinson*, 658 F.3d 549,  552, 557 (6th Cir. 2011) (affirming dismissal of 13

state-law theories of recovery, including breach of fiduciary duty, as preempted by SLUSA);

*Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 312 (6th Cir. 2009) (same, as to breach of

fiduciary duty and other state law claims); *Prager v. Knight/Trimark Group, Inc.*, 124 F. Supp.

2d 229, 234-35 (D.N.J. 2000) (claims for breach of fiduciary duty and other state law claims

barred by SLUSA, where complaint alleged defendant made false and misleading statements

relating to best execution while engaging in a four-year "pattern and practice of trading in

---

[33]      *See* Compl. ¶¶ 31 (Order Execution Frequently Asked Questions on TD Ameritrade's website),
32 (June 12, 2014 press release), 33 (earnings call in 2014), 34 (TD Ameritrade's Form 10K, filed
November 22, 2013), 35 (another website disclosure), 36 (public testimony by Steve Quirk to the U.S.
Senate), 37 (Client Agreement), 40.

advance of its retail customers and the selling or buying at a profit at the expense of its customers"); *see also Kurz v. Fidelity Mgt. & Research Co.*, No. 07-cv-709, 2008 WL 2397582, at *4-5 (S.D. Ill. June 10, 2008), *aff'd*, 556 F.3d 639 (7th Cir. 2009) (dismissing breach of contract action as preempted by SLUSA, where defendants were accused of breaching "best execution" provisions contained in trade confirmations because they allegedly executed trades solely on the basis of their receipt of gifts).

Moreover, SLUSA preempts state law class action claims *even if parallel securities law claims are dismissed for failure to state a claim*. For example, in *Siepel*, the Eighth Circuit affirmed a motion to dismiss federal securities claims on the merits and state law claims (including for breach of fiduciary duty) as preempted by SLUSA. 526 F.3d at 1124. The facts alleged in *Siepel* are notable: the plaintiffs in that case alleged a scheme in which customers were told that assets were being invested in a particular way, but in fact, the assets were being invested in a different way that allowed the defendant to "indirectly extract additional fees and profits." *Id.*[34]

---

[34]   In addition, this Court's order in *Telco* is not contrary to the foregoing decisions, given the different allegations and facts at issue. In *Telco*, the plaintiff, which asserted breach of fiduciary duty and other claims, sought to certify a class of Ameritrade clients whose orders were not executed within four minutes of the time the order was placed, and were ultimately executed at a price worse for the client than the National Best Bid or Offer (NBBO). 2007 WL 203949 at *2-3. The *Telco* plaintiff further alleged that Ameritrade "failed to process cancellation orders and froze customer account funds." *Id.* at *1. There were no allegations regarding payment for order flow. After declining to certify the class, the Court went on to state that SLUSA did not preempt the claims because there were "no allegations of fraud forming the basis of plaintiff's proposed class claim." *Id.* at *11. Here, Plaintiff alleges what are in substance misrepresentations or omissions, and a manipulative and deceptive device, including that TD Ameritrade allegedly engaged in "self-interested routing of the Company's clients' orders to venues which paid the maximum liquidity rebate and/or paid for order flow, irrespective of whether such routing would optimize execution quality." (Compl. ¶ 1.)

        b.     *Plaintiffs' Allegations Involve In Substance A Manipulative Or Deceptive Device.*

This SLUSA element is additionally (and independently) satisfied because, "based on a fair reading" of "the conduct alleged" in the Complaint, Plaintiffs also expressly allege that the TD Ameritrade and Mr. Tomczyk "employed devices, schemes and artifices to defraud in connection with the purchase and sale of security," which they describe as TD Ameritrade's and Mr. Tomczyk's decision to route orders solely on the basis of the highest liquidity rebates and payment for order flow.  *See*, *e.g.*, Compl. ¶ 82; *Kutten*, 530 F.3d at 670.

For either or both of these reasons, this SLUSA requirement has been satisfied, too.

**4.    Plaintiffs Allege That TD Ameritrade's And Mr. Tomczyk's Conduct Was In Connection With The Purchase Or Sale Of Covered Securities.**

Plaintiffs have expressly conceded that the final SLUSA requirement is satisfied: the Complaint alleges that TD Ameritrade and Mr. Tomczyk's conduct was "in connection with the purchase or sale of a covered security."  *Sofonia*, 465 F.3d at 876 (citing 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2)) (emphasis added).  Indeed, throughout the Complaint, Plaintiffs allege that the alleged conduct was "in connection" with the purchases or sales of covered securities.  (*See, e.g.*, Compl. ¶ 82 (asserting securities fraud "in connection with the purchase and sale of securities"); accord *id.* ¶¶ 2, 15, 72, 76, 88.)  Thus, the Complaint satisfies SLUSA's broad "in connection with" requirement.  *See*, *e.g.*, *Dabit*, 547 U.S. at 85 (extending to SLUSA prior "in connection with" precedent in "context of § 10(b) and Rule 10b-5," including broad precedent that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else"); *accord Siepel*, 526 F.3d at 1127 ("the 'in connection with' standard of Section 10(b) is construed flexibly, not technically or restrictively); *see also*, *e.g.*, *Atencio v. Smith Barney*, No. 04cv5653, 2005 WL 267556, at *6 (S.D.N.Y. Feb. 2, 2005) ("If, as alleged, defendants' receipt of kickbacks caused defendants to steer class members to certain funds, then

those class members' claims for damages from 'retention kickbacks' are inextricably related to

their purchases of shares of those funds.") (denying motion to remand and dismissing on SLUSA

grounds claims against financial advisors and fund families).[35]

Because, as we have shown, this SLUSA element and all others are satisfied, SLUSA

precludes Plaintiffs' breach of fiduciary duty claim, and the entire state law portion of the

Complaint must be dismissed.

### E.   Plaintiffs' Breach Of Fiduciary Duty Claim Is Preempted By Federal Regulations.

In addition to preemption by SLUSA, Plaintiffs' breach of fiduciary duty claim conflicts

with and intrudes upon the federal regulatory framework (as implemented by the SEC)

governing best execution and payment for order flow, and should be dismissed as preempted.

Plaintiffs' claims would require this Court to find as a violation of law conduct that federal

regulations do not prohibit.  *See, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,

559 F.3d, 772, 776-77, 780 (8th Cir. 2009) (concerning stock borrower program); *see also*, *e.g.*,

Part IV(E)(3), *supra* (collecting cases); *Final Rule: Disclosure of Order Execution and Routing

Practices*, 2000 WL 1721163, at *12 ("Furthermore, the Commission believes that the

possibility of multiple, inconsistent standards in interpreting this [predecessor Rule 606]

information in relation to various state law claims could tend to frustrate the statutory objective

of establishing and monitoring the development of a national market system and would

---

[35]     *Cf. Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058, 1061 (2014) (finding that SLUSA did not apply because subject securities were uncovered, but making clear that "[w]e do not here modify *Dabit*").  The Eighth Circuit's pre-*Dabit* opinion in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002) -- which held that SLUSA's "in connection with" requirement was not satisfied where the claim related to monthly subscription services for real time stock quotes -- does not warrant a different conclusion.  The Eighth Circuit has since limited *Green* to the extent it narrowly construed the "in connection with" requirement.  *Siepel*, 526 F.3d at 1127.  Moreover, the breach of contract claim at issue in *Green* was *not* inextricably intertwined with purchases and sales of securities, as is the case here, because it involved stock quotations rather than actual orders.  *Compare Green*, 279 F.3d at 598, *with* Compl. ¶ 1.

undermine the Commission's effort to assure the practicability of brokers achieving best execution.").  For that reason, numerous courts – including the highest courts of New York, Illinois, Pennsylvania and Minnesota – have found similar challenges to payment for order flow to be preempted on that basis.

### 1. State Law Claims That Conflict With The Purpose And Objectives Of The Federal Regulatory Framework Are Preempted.

Under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, a state law may be preempted by federal law in three circumstances: where Congress (as in SLUSA) explicitly preempts state law ("express preemption"), where preemption is implied because Congress has occupied the entire field of law ("field preemption"), and where preemption arises from a conflict between federal and state law ("conflict preemption" or "obstacle preemption").  *See Capital Cities Cable Inc. v Crisp*, 467 U.S. 691, 699 (1984); *see also Arizona v. U.S.*, 132 S. Ct. 2492, 2505 (2012) (referring to conflict preemption, and observing it is a "well settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes. . . . A pre-emptive regulation's force does not depend on express congressional authorization to displace state law.").  Preemptive effect is also accorded not only to acts of Congress but also to regulations promulgated by federal agencies such as the SEC,[36] and to rules of self-regulatory

---

[36]     *See, e.g.*, *Guice*, 674 N.E.2d at 286; s*ee also Capital Cities*, 467 U.S. at 699 (Federal Communications Commission).  State common law, as well as statutes, may be preempted.  *See CSX Transportation, Inc. v Easterwood*, 507 U.S. 658, 675 (1993) (Secretary of Transportation's regulations preempted plaintiff's common law negligence action); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154-55, 159 (1982) (Federal Home Loan Bank Board's due-on-sale regulation preempted California common law doctrine limiting due-on-sale provisions).

organizations such as FINRA where their rules are subject to SEC review and approval.[37]

For there to be conflict preemption, there need not be directly opposing duties between federal and state law that would render compliance with both a literal impossibility. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379-80 (2000) (citations omitted) (even if the federal and state laws "share the same goals . . .[t]he fact of a common end hardly neutralizes conflicting means"); *Securities Indus. Ass'n v Connolly*, 883 F.2d 1114, 1118 (1st Cir. 1989) ("a direct, facial contradiction between state and federal law is not necessary to catalyze an 'actual[ ] conflict', . . .") (citation omitted), *cert. denied*, 495 U.S. 956 (1990).  Instead, an irreconcilable conflict sufficient to give rise to conflict preemption will exist if state law undermines the federal regulatory framework or when state law "stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . ."  *Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996) (citation omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and effects . . . that which needs must be implied is of no less force than that which is expressed."  *Crosby*, 530 U.S. at 373 (quotation omitted).  Preemption under such circumstances is well-established.[38]

If a state statutory or common law claim affects "an area where there has been a history of significant federal presence . . . there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers."  *U.S. v. Locke*, 529 U.S. 89, 108 (2000); *see*

---

[37]     *See, e.g., Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 776-77, 780 (8th Cir. 2009) (concerning stock borrow rules approved by SEC); *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 676 n.7 (9th Cir. 2013) (NASD rules); *Myers v. Merrill Lynch & Co., Inc.*, No. 98-3532, 1999 WL 696082, at *8-9 &  n. 13 (N.D. Cal. 1999) (NASD rules), *aff'd* 249 F.3d 1087 (9th Cir. 2001) (all of the plaintiff's state law "claims were preempted by federal regulation of securities transactions"); *In re Application of Brenner*, 652 N.Y.S.2d 249, 252 (N.Y.A.D. 1996) (NYSE rules), *motion for leave to appeal dismissed as moot*, 90 N.Y.2d 921 (N.Y. 1997).

[38]     *See Int'l Paper Co. v. Ouellete*, 479 U.S. 481, 491-92 (1987); *Hillsborough Co., Fla. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713 (1985).

*also Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 347-48 (2001). Here, there can be no question that there is a "significant federal presence" and an important federal interest involved. Congress has determined that the "*national* public interest" requires a "*national* market system" and a "*national* system for clearance and settlement of securities transactions." 15 U.S.C. § 78b (emphasis added). *See also*, *e.g.*, *Pet Quarters*, 559 F.3d at 780-81 (affirming dismissal of action as preempted); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 707 (2d Cir. 1998), *cert. denied*, 525 U.S. 1144 (1999); *Guice*, 674 N.E.2d at 286; *see also* Part IV(E)(3), *infra* (citing additional cases concerning payment for order flow that were dismissed as preempted). As explained below, order flow payments and order execution are the subject of extensive federal regulations. *See* IV(E)(2), *infra*. Those federal regulations, when applied here, demonstrate that Plaintiffs' state law breach of fiduciary duty claim conflicts with the regulatory framework and must be preempted. *See* IV(E)(3), *infra*. Indeed, the resolution of Plaintiffs' breach of fiduciary duty claim necessarily would extend far beyond the parties' individual relationship, and would invade this federal regulatory framework. And when faced with similar state law claims that infringed upon this federal regulatory framework, the vast majority of courts that have addressed those claims have dismissed them as preempted. *See* IV(E)(3), *infra*.

### 2. Order Flow Payments And Order Execution Are The Subject Of Extensive Federal Regulation.

As explained further in Part II(B)-(C), *supra*, for decades, order flow payments and order execution have been the subject of extensive federal regulation. *See also generally*, *e.g.*, *Guice*, 674 N.E.2d at 286 (describing the extensive federal regulatory framework relating to payment for order flow). This regulatory structure arose out of Congress' 1975 amendments to the Securities Exchange Act of 1934, wherein "Congress directed the [SEC] to facilitate the establishment of a prompt, accurate national clearance and settlement system to protect investors

43

and the public interest." *Pet Quarters*, 559 F.3d at 776-77, 780.  *See also* 15 U.S.C. § 78k-1(a)(2) (directing the SEC to establish such a system "in accordance with these findings."); Part II(B)-(C), *supra*.  Congress further instructed the SEC, "by rule or order, to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system[.]"  *Id.* at 78k-1(a)(3)(B).

Pursuant to this delegation of power, the SEC has promulgated federal regulations addressing (i) disclosure of order execution and routing; (ii) the propriety and disclosure of payment for order flow; and (iii) execution requirements.  *See* Part II(B)-(C), *supra* (discussing the federal regulatory rules regarding these issues).  In addition to these Rules, the regulatory history reveals that the SEC has studied the potential conflicts of interest raised by payment for order flow, but rather than banning the practice, the SEC chose to regulate it through the process of mandated disclosures and an emphasis on "regular and rigorous" review of execution quality. *See* Payment for Order Flow, 1994 WL 587790, at *7-8.  Moreover, the SEC has long recognized that payment for order flow can result in benefits for retail investors, including in the form of "lower commission charges to investors, expeditious executions and enhanced services." Proposed Rule, Payment for Order Flow, Exchange Act Release No. 34-33026, 58 Fed. Reg. 52,934, 52,939-40, 1993 WL 403286 (proposed Oct. 6, 1993); *see also, e.g.,* Payment for Order Flow, 1994 WL 587790, at *8; *Guice*, 674 N.E.2d at 288 (addressing same).

The SEC and FINRA have hardly neglected this field; indeed, they have brought many enforcement actions for violations of this regulatory framework.  *See*, *e.g*., *Geman v. SEC*, 334 F.3d 1183, 1190 (10th Cir. 2003) (affirming SEC finding that broker-dealer violated its duty of best execution by failing to disclose that its method of executing orders deprived customers of

the possibility of getting a price better than the NBBO); *In re Scottrade*, *Inc.*, 93 S.E.C. Dkt. 1550, 2008 WL 2510611, at *1-2 (June 24, 2008) (settled action finding that retail broker violated its duty of best execution because, contrary to representations to its clients, it did not have written policies and procedures to assess liquidity at the market opening provided by market centers to which it routed NASDAQ pre-open orders and therefore did not consider the availability of executions that may have been superior to the NBBO for those orders).[39]

### 3.     Plaintiffs' State Law Claims Conflict With The Federal Regulatory Framework.

Plaintiffs allege that they were owed "fiduciary duties, including the duty of best execution," and they allege further that TD Ameritrade and Mr. Tomczyk "breach their fiduciary duties by self-interestedly routing the Class members' orders to venues in order to maximize liquidity rebates and payment for order flow, thereby failing to provide best execution." (Compl. ¶¶ 95-96.)  And Plaintiffs allege that TD Ameritrade improperly "pocketed" order flow payments rather than pass them on to clients.  (Compl. ¶ 69-71.)

But Plaintiffs concede that the content of the duty of best execution derives from federal rules such as FINRA Rule 5310 (and its predecessor NASD 2320).  (Compl. ¶¶ 38-39).  These rules, in turn, are part of a larger federal framework including SEC Rule 10b-10, SEC Rule 606, SEC Regulation NMS, and cases applying these rules and regulations.  Thus, Plaintiffs' common law breach of fiduciary duty claim would involve the court in interpreting an inherently federal framework under the auspices of state law.  *See Pet Quarters,* 559 F.3d at 780-82 (affirming

---

[39]     *See also*, *e.g.*, *In re Morgan Stanley & Co., Inc*., 90 S.E.C. Docket 1625, 2007 WL 1364323, at *1-2 (May 9, 2007) (settled action finding that broker-dealer violated its duty of best execution by embedding undisclosed mark-ups and mark-downs in retail orders for over-the-counter securities); *In re Certain Market Making Activities on NASDAQ*, 68 S.E.C. Dkt 2693, 1998 WL 919673 (Jan. 11, 1999) (settled action finding that NASDAQ market makers failed to provide best execution for their customers' orders by favoring their own interests, or those of a cooperating market maker, over the interests of their customers)

preemption of state law misrepresentation claims regarding a federal approved stock borrowing program; "these claims are preempted because they seek a determination from a state factfinder that a program declared efficient in rules approved under federal law was in fact not"); *see also generally NASDAQ OMX Group, Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1020-23 (2d Cir. 2014) (affirming exercise of federal jurisdiction in order-execution claim against NASDAQ market, reasoning that, "although UBS's claims for relief may invoke state law of contract and tort, the duty on which these claims turn-and their particular scope as it pertains to UBS in participating in the Facebook IPO—necessarily raises disputed issues of federal securities law"; while claim purported to be based on listing agreement, "the Services Agreement does not itself specify how NASDAQ was to fill and confirm orders or otherwise conduct an IPO. Those obligations are delineated in NASDAQ's own rules . . . whether a registered securities exchange such as NASDAQ has violated its federally prescribed duty to operate a fair and orderly exchange necessarily raises a disputed question of federal law").

Plaintiffs' theory is that TD Ameritrade violated its duty of best execution by routing its orders to those order venues and exchanges that offered payment for order flow, rather than considering individual factors that may affect the best execution of particular trades.  (Compl. ¶¶ 26-28.)  But this is not the federal standard, which allows for broker-dealers to route orders to sources of payment for order flow so long as they conduct "regular and rigorous review" of those sources to determine whether are "any material differences in execution quality."  FINRA Rule 5310, Supplementary Material .09(b).  The Complaint nowhere suggests that TD Ameritrade failed to conduct such a review or conducted one and disregarded its conclusions; Plaintiffs merely recite statistical information provided under Rule 606 – the very citation of which demonstrates TD Ameritrade's compliance with federal rules – and research studies that are not

46

alleged to have analyzed TD Ameritrade's actual trading.  (Compl. ¶¶ 58-66.)  In adopting the

predecessor to SEC Rule 606, the SEC not only found that using Rule 606 statistics to hold

brokers liable for breaches of duty "would be contrary to the Commission's prior statements . . .

about the duty of best execution," but also explained that it "believes that the possibility of

multiple, inconsistent standards in interpreting this [statistical] information in relation to various

state law claims *could tend to frustrate the statutory objective of establishing and monitoring the*

*development of a national market system and would undermine the Commission's effort to*

*assure the practicability of brokers achieving best execution*."  Disclosure of Order Execution

and Routing Practices, Exchange Act Release No. 34-43590, 2000 WL 1721163, at *13.

(emphasis added) (citing *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282 (N.Y. 1996), *cert.*

*denied*, 520 U.S. 1118 (1997)).  Under Plaintiffs' own theory, TD Ameritrade could be found in

breach of best execution duties even if it complied with the best execution requirements

approved by the SEC, and on the basis of information the SEC itself does not consider evidence

of a best execution violation.  This would amount to "nothing more than a complaint about the

Commission approved . . . methods" for determining compliance.  *See Pet Quarters,* 559 F.3d at

781.

        Moreover, while Plaintiffs contend that the payment for order flow payments are

improper and should have been passed on to clients (Compl. ¶¶ 69-71), the SEC has never

banned payment for order flow as an improper payment or "kickback."  Instead, the SEC has

required that broker-dealers make disclosure regarding payment for order flow.  *See, e.g.*, SEC

Rule 10b-10; Rule 606 to SEC Regulation NMS.  Thus, Plaintiffs would apply a standard that

deems illegal the very practice the SEC has studied and chosen to allow, by holding that the

acceptance of payment for order flow taints the execution of *all* orders, not merely those orders

47

that did not receive best execution.  *But see Shulick v. PaineWebber, Inc.*, 722 A.2d 148, 149 (Pa. 1998) (preempting state law claims regarding payment for order flow, where plaintiff "avers that the payments could have caused orders to be placed through exchanges and dealers that did not provide the best execution possible in terms of price, etc.").

Challenges to receipt and retention of payment for order flow were at the heart of the determination by numerous courts in the 1990s that suits asserting claims for breach of fiduciary duty from the receipt of such payments would effectively ban the practice and were preempted: "[a]ny ruling which implies that the order flow payments might have to be remitted to the customer on a case-by-case basis would be impossible to fulfill and would require the termination of the practice of order flow payments. . . . Thus, the remedy [Plaintiffs] seek could frustrate the objectives of the SEC and Congress."  *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918, 925 (Minn. 1996) (affirming federal preemption of state law claims relating to payment for order flow – "[a] decision by this court affecting these payments will no doubt reach far beyond the borders of Minnesota").  *See also id.* at 925-26 ("We believe that order flow payments are a useful competitive tool and that a decision requiring them to be returned to the customer would have a seriously negative impact on the efficacy of this tool.  In turn, given the complicated and intricate nature of the securities industry, anything affecting a practice as widely utilized as this one will have a significant impact on the securities markets nationwide. Whether this impact will be positive or negative is not for this court to judge."); *Shulick*, 722 A.2d at 151 (preempting claims for breach of contract and fiduciary duty relating to payment for order flow); *Orman v. Charles Schwab & Co.*, *Inc.*, 688 N.E.2d 620, 626 (Ill. 1997) ("Allowing plaintiffs to advance their breach of fiduciary duty and contract claims would require the defendants to identify the nature and calculate the value of order flow payments received so that Plaintiff's damages (the

48

improperly retained order flow payments) could be assessed" and doing so would have
"deleterious effects to the National Market System" because it would "effectively bring the
practice of order flow payments to a halt."); *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282,
291 (N.Y. 1996) (state law claims preempted by less restrictive SEC regulations permitting
brokers to receive payment for order flow with proper disclosure, because, among other things,
disclosures "which may be required under State common-law … inevitably will supplant the
disclosure rules of the SEC"; enforcing the claims "would unavoidably result in serious
interference with the accomplishment and execution of the full purposes and objectives of
Congress . . . and would directly conflict with SEC regulations limiting the disclosure
requirements regarding receipt of order flow payments.").[40]  In fact, courts have found
preemption merely where a state-law cause of action would reduce the value of a benefit the
federal framework allowed brokers and other financial institutions to retain[41] – as a rule
disgorging order flow payments even where the federal best-execution rules have been complied
with would do.

The Nebraska Supreme Court, in *Zannini v. Ameritrade Holding Corp.*, 266 Neb. 492
(2003), distinguished the *Guice* line of cases on the grounds that the federal regulation at issue in
*Zannini* (regarding "operational capability") was merely proposed and not yet enacted.  *Id.* at
504.  But this case involves the very situation that *Zannini* regarded as a proper case for

---

[40]     *See also Eirman v. Olde Discount Corp.*, 697 So.2d 865 (Fla. Ct. App. 1997) (dismissing order
flow payment action as preempted, based on the reasoning in *Guice*, *Orman* and *Dahl*); *McKey v. Charles
Schwab & Co., Inc.*, 67 Cal.App.4th 731, 734 (Cal. Ct. App. 1998) (same, where "[t]he thrust of the
complaint is that a broker which receives monetary and nonmonetary incentives from wholesale securities
dealers will place its order with those dealers, without regard to the best interests of the client.").

[41]     *See Levitin*, 159 F.3d at 704-07; *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563-64 (6th
Cir. 1998); *Estate of Braunstein v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 657 N.Y.S.2d 12, 13
(N.Y.A.D. 1997), *app. dismissed*, 686 N.E.2d 1366, *app. denied*, 691 N.E.2d 630 (1997), *cert. denied*,
523 U.S. 1119 (1998).

49

preemption.  *Zannini*, 266 Neb. at 503-04 (explaining that, in *Guice*, there were "explicit

commission regulations" concerning the Plaintiff's "complaints regarding order flow payments"

and, as a result, the *Guice* court ruled that "New York common law was preempted because it

could interfere with the regulations which exhibited the method by which the federal government

sought to reach its stated goal regarding order flow"); *see also Knights of Columbus Council

3152 v. KFS BD, Inc.*, 280 Neb. 904, 911-14 (2010) (affirming dismissal of breach of contract

claim where regulatory rules regarding federal recordkeeping duties did not confer a private right

of action).

   Accordingly, application of state law to Plaintiffs' breach of fiduciary duty claim would

conflict with the federal laws regarding the national market system and the SEC's and FINRA's

regulatory framework.  *See, e.g.*, *Guice*, 674 N.E.2d at 290 ("When, thus, a State's regulation,

through the imposition of common-law tort liability or otherwise, adversely affects the ability of

a Federal administrative agency to regulate comprehensively and with uniformity in accordance

with the objectives of Congress, 'then the state law may be pre-empted even though 'collision

between the state and federal regulation may not be an inevitable consequence.''") (citing

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988)).

   For all of these reasons, Plaintiffs' breach of fiduciary duty claim must be dismissed as

preempted by federal regulation of payment for order flow and order execution.

   **F.      Plaintiffs Fail Adequately To Plead A Breach Of Fiduciary Duty Claim**.

   Even if Plaintiffs' breach of fiduciary duty claim is not preempted by either SLUSA or

federal regulations, it otherwise fails to state a claim and should be dismissed.

   To state a breach of fiduciary duty claim under Nebraska law, Plaintiffs must plead that

(1) that the defendants owed it a fiduciary duty, (2) they breached the duty, (3) the breach was

the cause of the alleged injury, and (4) Plaintiffs were damaged.  *See McFadden Ranch v.*

*McFadden*, 19 Neb. App. 366, 370 (Neb. App. Ct. 2011).  Plaintiffs' fiduciary duty claim is based on the same factual allegations they assert in support of their Section 10(b) claim.  (*See*, *e.g.*, Compl. ¶ 94.)  Thus, their fiduciary duty claim sounds in fraud and must be pled with particularity, pursuant to Rule 9(b).  *See*, *e.g.*, *Dikeman v. Wilkinson*, No. CV85-L-673, 1986 WL 12801, at *2 (D. Neb. Feb. 21, 1986) (granting motion to dismiss and explaining that breach of fiduciary duty claim premised on allegations of "defendants misleading the plaintiffs . . . is essentially an allegation of fraud"); *Crocker v. KV Pharm. Co.*,  782 F. Supp. 2d 760, 784-85 (E.D. Mo. 2010) (breach of fiduciary duty claim involving "scheme to misrepresent" sounds in fraud); *McGraw v. Wachovia Secs, LLC*, No. 08cv2064, 2009 WL 2949290, at *5 (N.D. Iowa Sept. 10, 2009) ("Parties must plead all averments of fraud with particularity, even if the claims are not expressly labeled as 'fraud.'") (quotation omitted).  Plaintiffs' fiduciary duty claim thus fails for the same reason as their Rule 10(b) claim – Plaintiffs have failed adequately to allege that TD Ameritrade did not *seek* to provide best execution reasonably available under the circumstances.  *See* Part II, *supra*.[42]

In addition, while Plaintiffs assert conclusorily that "Defendants" owed Plaintiffs fiduciary duties, including the duty of best execution (Compl. ¶ 95), Plaintiffs do not allege any basis to conclude that Mr. Tomczyk owes such duties to TD Ameritrade clients.  *See generally*, *e.g*., *Krys v. Butt,* 486 Fed.Appx. 153 (2d Cir. 2012) (no such duty under New York law).  Thus, even if Plaintiffs' breach of fiduciary duty claim is sustained as to TD Ameritrade, Inc. and TD Ameritrade Holding Corporation, it should be dismissed as to Mr. Tomczyk.

---

[42]     Plaintiffs' breach of fiduciary duty claim is deficient whether viewed under Rule 8 or Rule 9(b).

## V. <u>CONCLUSION</u>

For the foregoing reasons, the TD Ameritrade Defendants respectfully submit that their

motion to dismiss should be granted, and request that Plaintiffs' Complaint be dismissed with

prejudice.

Dated this 24th day of March, 2015.

TD AMERITRADE HOLDING CORPORATION,
TD AMERITRADE, INC. and FREDRIC J.
TOMCZYK, Defendants

By: *s/ Victoria H. Buter*
    Thomas H. Dahlk #15371
    Victoria H. Buter #23841
    KUTAK ROCK LLP
    The Omaha Building
    1650 Farnam Street
    Omaha, Nebraska  68102-2186
    Telephone: (402) 346-6000
    Facsimile: (402) 346-1148
    tom.dahlk@kutakrock.com
    vicki.buter@kutakrock.com

    A. Robert Pietrzak *(admitted pro hac vice)*
    Alex J. Kaplan *(admitted pro hac vice)*
    Jackie A. Lu *(admitted pro hac vice)*
    SIDLEY AUSTIN LLP
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile: (212) 839-5599
    rpietrzak@sidley.com
    ajkaplan@sidley.com
    jlu@sidley.com

    *Attorneys for Defendants*
    *TD Ameritrade Holding Corporation, TD*
    *Ameritrade, Inc., and*
    *Fredric Tomczyk*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24th, 2015, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to the following attorneys registered with the CM/ECF system:

Christopher J. Kupka, Esq.          Nancy A. Kulesa, Esq.
Eduard Korisnsky, Esq.             Sebastiano Tornatore, Esq.
LEVI & KORSINSKY LLP               LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor         733 Summer Street, Suite 304
New York, New York  10004          Stamford, Connecticut  06901
Telephone: (212) 363-7500          Telephone: (212) 363-7500
Fax: (866) 367-6510                Fax: (866) 367-6510
ckupka@zlk.com                     nkulesa@zlk.com
ek@zlk.com                         stornatore@zlk.com


Gregory C. Scaglione                Katrina Carroll,Esq.
Patrice D. Ott                     Joseph J. DePalma, Esq.
KOLEY, JESSEN LAW FIRM             LITE DEPALMA GREENBERG, LLC
1125 South 103rd Street            Two Gateway Center, 12th Floor
Suite 800, One Pacific Place       Newark, New Jersey  07102
Omaha, Nebraska  68124             Telephone: (973) 623-3000
greg.scaglione@koleyjessen.com     Fax: (973) 623-0858
patrice.ott@koleyjessen.com        kcarroll@litedepalma.com
                                   jdepalma@litedepalma.com


                    By: *s/ Victoria H. Buter*
                         Victoria H. Buter