IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GERALD J. KLEIN,<br><br>　　　　　　**Plaintiff,**<br><br>　　vs.<br><br>**TD AMERITRADE HOLDING<br>CORPORATION,<br>TD AMERITRADE, INC., and<br>FREDRIC TOMCZYK,**<br><br>　　　　　　**Defendants.** | **8:14CV396**<br><br>**FINDINGS AND<br>RECOMMENDATION** |

This matter is before the court on the defendants' Motion to Dismiss Putative Amended Class Action Complaint and Request to Take Judicial Notice (Filing No. 79). The defendants filed a brief (Filing No. 80) and a corrected index of evidence (Filing No. 93) supporting the motion. The plaintiff filed a brief (Filing No. 87) and an index of evidence (Filing No. 88) opposing the motion. The defendants filed a brief (Filing No. 94) in reply. The plaintiff's request for oral argument is denied as unnecessary and for failure to comply with NECivR 7.1(d) by including the request in the brief rather than by filing a timely motion. **See** Filing No. 87 - Response p. 83.[1] Similarly, the plaintiff's request for leave to amend is denied, without prejudice for failure to comply with NECivR 15.1. **Id.**

## BACKGROUND

The plaintiff challenges the defendants' practice of routing customers' non-directed orders to trading venues that pay the defendants the largest payments (either by liquidity rebates or order flow payments) rather than to those trading venues who will fulfill its duty of best execution. **See** Filing No. 75 - Amended Complaint ¶¶ 8-9. The defendants provide securities broker-dealer services as a financial services company, its parent company, and Chief Executive Officer Fredric Tomczyk (Tomczyk). **Id.** ¶¶ 22-24. The plaintiff, who alleges he has been the defendants' client continuously throughout the class period, "purchased shares of U.S. based exchange-listed stocks in

---

[1] All page number references correspond to the numbers assigned when filed in the CM/ECF system.

trades" during the class period, suffering damages from the defendants' unlawful conduct. *Id.* ¶ 19.  This plaintiff purports to represent all of the defendants' clients "who placed orders in connection with which [the defendants] received either liquidity rebates or payment for order flow." *Id.* ¶ 106.

The plaintiff alleges four separate claims for relief:  violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act); breach of fiduciary duty; and violations of Nebraska's Uniform Deceptive Trade Practices Act (UDTPA), Neb. Rev. Stat. §§ 87-301 to 87-306.  **See** Filing No. 75 - Amended Complaint ¶¶ 114-139. Generally, the plaintiff alleges the defendants disseminated misleading statements to the investing public by stating the defendants would provide best execution for trade orders placed by them for clients. *Id.* ¶¶ 6-14.  The plaintiff alleges the clients relied on such statements to their detriment because the defendants engaged in self-interested order routing for the purpose of maximizing liquidity rebates and order flow payments. *Id.* ¶¶ 8-9.  The plaintiff further alleges the orders subject to this practice lost value "in the form of economic loss due to [the clients'] orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution." *Id.* ¶¶ 13-14.

The defendants filed a motion to dismiss the plaintiff's Complaint on three grounds.  **See** Filing No. 79.  Initially, the defendants assert the plaintiff's state law claims are preempted by the Securities Litigation Uniform Standards Act of 1998 (SLUSA), 15 U.S.C. §§ 77p, 78bb(f).  *Id.*  Alternatively, the defendant argues the plaintiff's state law claims are preempted by federal regulation.  *Id.*  Finally, the defendant contends the plaintiff's Complaint fails to state a claim for relief on the merits of each claim.  *Id.*

For consideration of the motion, the defendants seek judicial notice of certain sections of the Federal Register and Code of Federal Regulations.  **See** Filing No. 79 - Motion p. 3-4.  Additionally, the defendants seek judicial notice of excerpts from a June 17, 2014, transcript for a hearing before a U.S. Senate subcommittee and other materials.  *Id.*  The plaintiff does not object to taking judicial notice of these documents, which are embraced by the Complaint.  **See generally** Filing No. 87 - Response & p. 49 n.10.  In any event, as part of the court's review of the defendants' motion, the court

may consider exhibits annexed to the Complaint or incorporated by reference.  **See** Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 732 (8th Cir. 2015); **see also** *SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 699 n.6 (S.D.N.Y. 2005) (taking judicial notice of transcripts relied upon by complaint).  The court takes judicial notice of the exhibits identified not for the truth of the facts asserted therein, but solely to determine the content of the testimony and regulations.

The plaintiff's Complaint relies on sources other than the plaintiff's personal knowledge for many of the allegations.  The Complaint references testimony given by Steven Quirk (Quirk), a senior executive for the defendant, and others before the U.S. Senate's Permanent Subcommittee on Homeland Security and Governmental Affairs, on June 17, 2014.  **See** Filing No. 75 - Amended Complaint ¶¶ 59-64; **see also** Filing No. 88-6 Ex. 1(E).  The Complaint also relies upon academic research regarding order routing practices of various brokers.  **See** Filing No. 75 - Amended Complaint ¶¶ 81-92.  The defendants oppose reliance on academic research and other information referenced by the plaintiff, arguing such materials are generic and irrelevant to the plaintiff's claims.  **See** Filing No. 80 - Brief p. 39-44.

## ANALYSIS

### A.   SLUSA Preemption

The court reviews dismissal of a state law claim based on SLUSA preemption as a dismissal for failure to state a claim.  *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670 (8th Cir. 2008); **see** *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 135 n.11 (2d Cir. 2015) (noting SLUSA preclusion reviewed under Rule 12(b)(6)).  Congress intended SLUSA, an amendment to the Securities Act of 1933 and the Securities Exchange Act of 1934, to preempt claims by plaintiffs eluding Federal law requirements and protections by filing specified types of actions in State court.  *Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 876 (8th Cir. 2006) (**citing** H.R. Rep. No. 105-803 (Oct. 9, 1998) (Conf. Rep.)).  Specifically, Congress sought to curb perceived abuses of class action cases involving securities and enforce heightened pleading requirements.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006).

Accordingly, SLUSA allows removal and "expressly preempts all state law class actions based upon alleged untrue statements or omissions of a material fact, or use of a manipulative or deceptive device or contrivance, in connection with the purchase or sale of a covered security." **Dudek v. Prudential Sec., Inc.**, 295 F.3d 875, 879 (8th Cir. 2002); **see** 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2).  The plaintiff disputes only whether the action alleges the defendants' conduct was "in connection with" the purchase or sale of a covered security.  **See** Filing No. 87 - Response p. 66-70.

The plaintiff argues his action is not the type targeted by SLUSA, for example cases having a "nuisance value outweigh[ing] their merits."  **Id.** at 66-67 (alteration in original) (**quoting Dabit**, 547 U.S. at 82).  Moreover, the plaintiff contends his state law claims are based on misrepresentations surrounding the plaintiff's "determination to enter into a contract for and/or continue using TD Ameritrade's broker services . . . . before a single security was ever transacted."  **Id.** at 69.  Therefore, the plaintiff asserts the state law claims accrued before the defendant conducted any securities transactions, unlike claims which may stem from securities transactions.  **Id.**

The Complaint describes the defendants as "broker[s], engag[ing] in routing . . . clients' orders to different venues to be executed."  **See** Filing No. 75 - Amended Complaint ¶ 7.  The Complaint alleges "this action for breach of fiduciary duties . . . in connection with self-interested routing of  . . . clients' orders to venues which paid the maximum liquidity rebate and/or paid for order flow, irrespective of whether such routing would optimize execution quality."  **Id.** ¶ 2.  The state law claims explicitly rely upon the defendants "self-interestedly routing . . . orders to venues in order to maximize liquidity rebates and payment for order flow, thereby failing to provide best execution."  **Id.** ¶¶ 130, 137-138.

"Under **Dabit**, however, 'it is enough that the fraud alleged "coincide" with a securities transaction—whether by the plaintiff or by someone else.'"  **Siepel v. Bank of Am., N.A.**, 526 F.3d 1122, 1127 (8th Cir. 2008) (**quoting Dabit**, 547 U.S. at 85) (concluding SLUSA prohibits "state-law claims that a trustee breached its fiduciary duty by failing to disclose conflicts of interest in its selection of nationally-traded investment securities").  The plaintiff contends a more narrow interpretation is required by **Chadbourne & Parke LLP v. Troice**, 134 S. Ct. 1058 (2014).  **See** Filing No. 87 -

4

Response p. 68.    In *Troice*, the Court held, "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"    *Troice*, 134 S. Ct. at 1066 (noting the Court "do[es] not here modify *Dabit*").

While the plaintiff contends his decision to associate with the defendants suffered from his reliance on fraudulent misrepresentations prior to any securities' order placement, the Complaint's allegations remain based on how the order placement materially affected and in "various ways . . . had a harmful impact on [the defendants'] clients' trades."    **See** Filing No. 75 - Amended Complaint ¶ 138.    The plaintiff's Complaint explicitly states the proposed class "suffered damages in connection with Defendants' routing of their orders."    *Id.* ¶ 122.    In any event, the plaintiff also alleges the defendants' conduct was based on an undisclosed policy and practice, in conflict with the defendants' website statements, pre-dating the orders whereby they were automatically sent to the particular market center providing the highest financial benefit to the defendants.    **See, e.g.,** *id.* ¶¶ 109-113.    In essence, the plaintiff relied on the defendants' alleged misstatements and omissions of information about the scheme to place the order.    This case is about execution of the securities orders rather than execution of relationship between the defendants and their clients.    Accordingly, in this case, as in *Segal*, the "allegations do not merely 'coincide' with securities transactions; they depend on them."    *Segal*, 581 F.3d at 310; see *Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (defining "coincide" as broad in scope to include the claims that "necessarily allege," "necessarily involve," or "rest on" the purchase or sale of securities).    Here, the plaintiff's allegations of misrepresentation and omission concern the best execution of the trades by routing the orders based on payment for order flow. Thus the alleged misrepresentations or omissions coincide with the purchase or sale of covered securities.    As all elements have been met, the plaintiff's claims are preempted by SLUSA and should be dismissed.

B.   **Federal Regulation Preemption**

The defendants argue resolution of the plaintiff's state law claims necessarily extends beyond the duties imposed by law to conflict with and intrude upon the federal regulatory framework governing order flow payments and order execution.  **See** Filing No. 80 - Brief p. 60.  The plaintiff denies his state law claims are preempted because no conflict exists between the federal regulations and the claims.  **See** Filing No. 87 - Response p. 70-73 (arguing claims based on "a common law duty of best execution would not frustrate the SEC's enforcement" of federal requirements).  Although the plaintiff does not dispute order flow payments are permissible, he contends the defendants allowed the amount of the payments to override all other factors when making order routing decisions, thereby breaching the fiduciary duty of best execution and deceptively misrepresenting their conduct in advertisements.  *Id.* at ¶¶ 100, 137-138; Filing No. 87 - Response p. 48.  In reply, the defendants contend the plaintiff attempts to add a motive-based standard and expand the fiduciary duty beyond the current federal regulation best execution requirements, creating a conflict between federal and state law.  **See** Filing No. 94 - Reply p. 32-36.

"Ordinary preemption is a federal defense that exists where a federal law has superseded a state law claim.  Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field."  ***Johnson v. MFA Petroleum Co.***, 701 F.3d 243, 248 (8th Cir. 2012) (internal citation omitted).  "Preemption may also be applied in situations where a state [law] directly conflicts with federal law, or in limited circumstances where 'a federal law completely occupies the field of regulation so that by implication there is no room for state regulation and the coexistence of federal and state regulation is not possible.'"  *Id.* (**citing *Florida Lime & Avocado Growers, Inc. v. Paul***, 373 U.S. 132, 142-43 (1963) and **quoting *Mo. Bd. of Exam'rs for Hearing Instrument Specialists v. Hearing Help Express, Inc.***, 447 F.3d 1033, 1035 (8th Cir. 2006)); **see *Guice v. Charles Schwab & Co.***, 674 N.E.2d 282, 285 (N.Y. 1996) (noting preemption applies to State statutory or regulatory law and common law) (**citing *Freightliner Corp. v. Myrick***, 514 U.S. 280, 286-87 (1995)).  "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope

6

of its congressionally delegated authority may pre-empt state regulation." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986).

The defendants appear to confine the challenge to conflict preemption. State law will conflict with federal law when "'compliance with both federal and state regulations is a physical impossibility' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Qwest Corp. v. Minnesota Pub. Util. Comm'n*, 684 F.3d 721, 726 (8th Cir. 2012) (**quoting** *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Otherwise, state law may coexist with the federal regulation to the extent they are not inconsistent. *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 137 (1973).

The potential conflict exists between the plaintiff's claims and the U.S. Securities and Exchange Commission's (SEC) implementation of Securities Exchange Act regulations. Effective May 31, 2012, the SEC approved FINRA[2] Rule 5310, known as the Best Execution Rule, which requires member firms, such as the defendant, to "use *reasonable diligence* to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." FINRA Rule 5310(a) (emphasis added). Reasonable diligence is determined by examining such factors as:

> (A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on available communications);
> (B) the size and type of transaction;
> (C) the number of markets checked; [and]
> (D) accessibility of the quotation[.]

*Id.* Moreover, the members are required to conduct a "regular and rigorous" review of the execution quality. *Id.* Supp. Material .09.

> In reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets, a member should consider the following factors:

---

[2] Financial Industry Regulatory Authority (FINRA) "enacts rules and publishes guidance in its role as regulator of securities firms and brokers." **See** Filing No. 80 - Brief p. 16 n.3.

> (1) price improvement opportunities (i.e., the difference between the execution price and the best quotes prevailing at the time the order is received by the market);
> (2) differences in price disimprovement (i.e., situations in which a customer receives a worse price at execution than the best quotes prevailing at the time the order is received by the market);
> (3) the likelihood of execution of limit orders;
> (4) the speed of execution;
> (5) the size of execution;
> (6) transaction costs;
> (7) customer needs and expectations; and
> (8) **the existence of internalization or payment for order flow arrangements**.

*Id.* (emphasis added).

The plaintiff pleads the defendants were obligated by a common law fiduciary duty and argues that "[w]hile there is significant overlap between the [federal and common law] duties, the common law iteration is a comparatively holistic approach that has not been reduced to an itemization of factors." **See** Filing No. 87 - Response p. 70-71. The plaintiff contends the state law duties pose no obstacle to compliance with the federal duties, nor do they frustrate the SEC's enforcement of FINRA Rule 5310. *Id.* The plaintiff argues the claim for breach of fiduciary duty arises from the defendants' failure to provide best execution and instead "self-interestedly routing . . . orders." **See** Filing No. 75 - Amended Complaint ¶¶ 129-130. Fundamentally, the plaintiff alleges the defendants' routing practice breached their duty of best execution by disregarding the wide variety of factors listed above, and instead relying exclusively on the payment for order flow arrangements. **See generally** *id.*; Filing No. 87 - Response p. 76-77. Similarly, the plaintiff's UDTPA claim merely alleges the defendants represented they would provide "'best execution' while adopting a course of conduct inconsistent therewith." **See** Filing No. 87 - Response p. 77. No conflict exists because the plaintiff's claims are consistent with the regulatory requirements.

Comparison in this case revolves around the manner in which the defendants are required to examine the factors leading to execution quality. Here, the regulations require the defendants to conduct a "rigorous" review of a variety of factors, including payment for order flow arrangements, which review may provide evidence of the defendants' reasonable diligence in determining the best market for the subject security.

The improper conduct alleged by the plaintiff, failure to consider a variety of factors, runs afoul of both the alleged common law duty and the relevant federal regulation.  The alleged obligations do not diverge from the federally imposed standards.  Accordingly, compliance with the contract language and other alleged duties creates no physical impossibility or obstacle to compliance with federal regulation or its purposes.

The cases relied upon by the defendants similarly suggest this result.  Those cases analyze the SEC's treatment of payment for order flow disclosures, finding "State common-law agency principles inevitably will supplant the disclosure rules of the SEC" such that brokers merely complying with Federal regulations would be unable to avoid civil liability.  *Guice*, 674 N.E.2d at 291 (finding implied conflict preemption); **see also *Shulick v. Painewebber, Inc.***, 722 A.2d 148, 151 (Pa. 1998) (holding "federal regulation of the narrow subject of disclosure of order flow payments is so thorough that we have no difficulty in finding . . . that no room has been left for a state to impose additional requirements").  **But see *Dahl v. Charles Schwab & Co.***, 545 N.W.2d 918, 925-26 (Minn. 1996) (finding state law payment for order flow consent requirements preempted because "given the complicated and intricate nature of the securities industry, anything affecting a practice as widely utilized as this one will have a significant impact on the securities markets nationwide").  Payment for order flow disclosures are not at issue in this case.  Nevertheless, mere compliance with the federally imposed standards would not create liability under the alleged duties.  Likewise, mere compliance with the alleged duties would not upset the balance of regulatory goals struck by the SEC rules.  Therefore, conflict preemption principles create no impediment to the plaintiff's claims and the defendants' motion on this basis should be denied.


## C.    Plausibility of Claims

In the alternative, the defendants move to dismiss the plaintiff's claims for breach of fiduciary duty and violation of state statute for failure to state a viable claim.  **See** Filing No. 79 - Motion p. 2-3.  Specifically, the defendant argues the Complaint falls short of the pleadings required under either Fed. R. Civ. P. 9(b), or even under the more liberal standard of Fed. R. Civ. P. 8, to state a claim plausible on its face.  ***Id.***

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (**quoting** Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

While the court must accept as true the factual allegations, such imperative does not apply to legal conclusions.  *Zayed*, 779 F.3d at 732-33.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A court engages in a context-specific exercise drawing "on its judicial experience and common sense" to determine whether a complaint states a plausible claim for relief.  *Id.* at 679.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (**quoting** *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

In addition, under the Federal Rules, a party alleging fraud must state with particularity the circumstances constituting fraud.  **See** Fed. R. Civ. P. 9(b).  Moreover, "[c]laims 'grounded in fraud' must meet this heightened pleading requirement." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1010 (8th Cir. 2015).  Courts interpret Rule 9(b) "in harmony with the principles of notice pleading" requiring the complaint to "allege 'such matters as time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" **See** *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (**quoting** *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)).  The rule requires the additional information "to enable the defendant to respond specifically and quickly to potentially damaging allegations."  *Id.*; **see** *Streambend*, 781 F.3d at 1010.  Additionally, application of the rule "deters the use

of complaints as a pretext for fishing expeditions of unknown wrongs." **Streambend**, 781 F.3d at 1010.  As with the Rule 8 requirements, mere "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy [Rule 9(b)]." **Drobnak**, 561 F.3d at 783; **see** **Streambend**, 781 F.3d at 1013 (noting "vague allegations do not satisfy Rule 9(b)").  Nevertheless, "[w]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge . . . such allegations may be pleaded on information and belief.  Rule 9(b) is deemed satisfied if the allegations are accompanied by a statement of facts on which the belief is founded." **Drobnak**, 561 F.3d at 783-84.

### 1.      Breach of Fiduciary Duty

The parties agree Nebraska case law governs the plaintiff's breach of fiduciary duty claim. **See** Filing No. 80 - Brief p. 71; Filing No. 87 - Response p. 73.  The Nebraska Court of Appeals held that "[b]ecause breach of fiduciary duty is akin to malpractice under Nebraska law and because malpractice is a form of negligence, . . . the elements of negligence constitute the elements of a breach of fiduciary duty cause of action." **McFadden Ranch, Inc. v. McFadden**, 807 N.W.2d 785, 789 (Neb. Ct. App. 2011).  Accordingly, a plaintiff must necessarily plead four elements to survive a motion to dismiss a claim for breach of fiduciary duty:  (1) the defendant owed the plaintiff a fiduciary duty, (2) which the defendant breached, (3) causing the plaintiff an injury, and (4) the plaintiff sustained damages. **Id.** at 790.  The defendants do not dispute TD Ameritrade, Inc. owed a duty of best execution to the plaintiff under the framework provided by FINRA Rule 5310. **See** Filing No. 80 - Brief p. 72.[3]  The defendants dispute whether the plaintiff alleged a breach of the duty causing injury or damages. **Id.** at 49-50, 71-72.

The Nebraska Supreme Court explained the duty of best execution in **Zannini**:

> The duty of best execution, which predates the federal securities laws, has its roots in the common law agency

---

[3]  The defendants deny the defendants Tomczyk or TD Ameritrade Holding Corporation owed any fiduciary duty to the potential class members or any basis exists for such a duty. **See** Filing No. 80 - Brief p. 72.  The plaintiff contends personal and corporate duties attach. **See** Filing No. 87 - Response p. 74-75.  The court need not resolve this issue based on its findings the plaintiff failed to plausibly allege breach of fiduciary duty against any defendant.

> obligations of undivided loyalty and reasonable care that an agent owes to his principal. Since it is understood by all that the client-principal seeks his own economic gain and the purpose of the agency is to help the client-principal achieve that objective, the broker-dealer, absent instructions to the contrary, is expected to use reasonable efforts to maximize the economic benefit to the client in each transaction. The duty of best execution thus requires that a broker-dealer seek to obtain for its customer's order the most favorable terms reasonably available under the circumstances.

*Zannini v. Ameritrade Holding Corp.,* 667 N.W.2d 222, 230-31 (Neb. 2003) (**quoting *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*,** 135 F.3d 266, 270 (3d Cir. 1998)). The *Zannini* explanation is consistent with FINRA Rule 5310.  **See** FINRA Rule 5310(a)(1) (establishing duty to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions"). The *Zannini* court and FINRA Rule 5310 provide additional guidance about factors, in addition to price, relevant to the best execution determination. *Zannini,* 667 N.W.2d at 231; FINRA Rule 5310(a).

The Complaint alleges the defendants breached their fiduciary duties, including the duty of best execution, "by self-interestedly routing the Class members' orders to venues in order to maximize liquidity rebates and payment for order flow, thereby failing to provide best execution."  **See** Filing No. 75 - Amended Complaint ¶¶ 128-132.  The plaintiff suggests the defendants' routing practice caused a conflict of interest for the defendants by allowing them to put their own interests ahead of their clients' interests, preventing best execution of the trades. *Id.* ¶¶ 10, 51, 56, 59, 95.  In support of these allegations, the plaintiff alleges the defendants had a duty to compare the execution quality between competing market centers by considering the relevant factors, including execution price and speed. *Id.* ¶¶ 5, 8-9, 13, 35.  Additionally, the plaintiff states the defendants considered the liquidity rebates and order flow payments. *Id.* ¶ 46.  The plaintiff alleges the defendants' routing policies and practices fail to comply with execution quality by directing the orders to trading venues based on maximizing order flow payments. *Id.* ¶¶ 46, 52-53.  The plaintiff relies on studies proposing a negative relationship exists between liquidity rebates and order execution quality. *Id.* ¶¶ 81-91.

Based on this relationship, the plaintiff suggests "[t]here is an inverse relationship between the length of time a resting limit order has been posted on an exchange and that order's fill-rate and subsequent performance." *Id.* ¶ 92. In addition, the plaintiff relies on Quirk's congressional hearing testimony confirming the defendant virtually always routed customer orders to venues paying the highest rebates. *Id.* ¶¶ 59-63.

Upon examination of the Complaint as a whole, the court finds the plaintiff's allegations fall short of reasonable inferences plausibly entitling the plaintiff to relief for breach of fiduciary duty. The plaintiff's allegations challenge the defendants' decision to route customer orders to venues paying rebates despite admitting he is not challenging the legality of payments for order flow. **See** Filing No. 87 - Response p. 48 (noting "mere receipt of payment for order flow does not constitute a violation of the duty of best execution"). Allegations attacking the practice of taker fees, and by extension receiving payments for order flow, without more, are inadequate to maintain a claim for breach of fiduciary duty.

Additionally, although Quirk testified as alleged by the plaintiff, such testimony is taken out of context. On June 17, 2014, the Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs of the U.S. Senate held a hearing on the topic of conflicts of interest, investor loss of confidence, and high speed trading in U.S. stock markets. **See** Filing No. 88-6 - Ex. 1(E) - Hearing Transcript (Tr.). Quirk spoke at the hearing, giving the following remarks, among others:

> Brokers are required to seek the most favorable terms reasonably available under the circumstances for client orders. At our firm we consider the opportunity to obtain a better price than currently quoted, the speed of execution, and the likelihood of execution, amongst other factors when making that assessment.
> We also give our clients a choice. Their orders can be routed using our proprietary order routing logic, or they can choose from a list of direct routing destinations.
> Finally, we work with multiple market destinations. Rather than internalize our client flow, we believe that routing all orders to the market is more transparent and better aligned with the needs of our clients. We select these market centers based on rigorous due diligence where execution quality is the top priority. After, and only after, a

market satisfies our standards for best execution do we consider transaction costs or revenue opportunities.

Filing No. 88-6 - Ex. 1(E) p. 42 - Tr. 37.

After making his statement, Quirk answered questions, including:

Senator LEVIN.  Is the size of the rebate offered by an exchange a factor in determining where you route nonmarketable customer orders?

Mr. QUIRK.  The way that our committees and the people responsible for order routing approach this is they start with the best execution, and they would go through a list of variables that we should consider as hurdles.  And in order to get to a point where the revenue sharing is even considered, those hurdles have to be cleared.

Senator LEVIN.  And the revenue sharing that you are talking about is the rebate?

Mr. QUIRK.  Correct, sir.

* * *

Senator LEVIN [continuing].  After you say you have looked at the other factors, and then you look at the rebate issue, my question is:  Is the size of the rebate offered by an exchange a factor in determining where you route those nonmarketable customer orders?

Mr. QUIRK.  Yes.  It would be the last factor.  All things being equal, that would be a factor.

Senator LEVIN.  And so the greater the rebate, that would be where you would go if it is otherwise best market.

Mr. QUIRK.  Yes.

*Id.* at 51 - Tr. 46.

Senator LEVIN.  And so, again, your subjective judgment as to which market provided best execution for tens of millions of customer orders virtually always led you to route orders to the markets that paid you the most.

* * *

Mr. QUIRK.  Virtually, yes.

*Id.* at 53 - Tr. 48.

The court finds Quirk's testimony, as referenced by the plaintiff, insufficient to support a reasonable inference the defendants' rebates overrode every other factor in the routing decisions.  Testimony, if true, that virtually all customer orders were routed through the highest paying markets, is potentially consistent with the plaintiff's theory, yet, standing alone, fails to support the inference the defendants neglected to consider

any of the other factors making up the duty of best execution. Moreover, even a cursory review of Quirk's contemporaneous hearing testimony directly and explicitly contradicts the plaintiff's interpretation. Quirk testified, "[a]fter, and only after, a market satisfies our standards for best execution do we consider transaction costs or revenue opportunities" and "[a]ll things being equal, [rebate size] would be a factor," but it "would be the last factor." *Id.* at p. 42, 51 - Tr. 37, 46.

Accordingly, the Complaint lacks factual support alleging the defendants failed to use reasonable diligence in determining best execution. The Complaint insufficiently asserts a plausible claim by relying solely on the alleged fact the defendants routed virtually all orders to a pre-determined venue based on the amount of the rebate. The plaintiff seemingly contends the defendants routing "virtually" all orders to venues paying for order flow *means* the defendants failed to consider any factor other than payment for order flow. The plaintiff's allegations are factually insufficient to support the inference the defendants neglected to consider any of the other factors required by the duty of best execution. The plaintiff's focus on a single factor, even if the factual support was objective and unopposed confirming the defendants' reliance on the factor, provides no reasonable inference about whether the defendants relied on or neglected any other factor. Accordingly, the plaintiff's claim the defendants breached a fiduciary duty by failing to consider a wide variety of factors in order routing decisions is unsupported by well-pled factual allegations sufficient to avoid dismissal without regard to whether the standard is Rule 8(a) or Rule 9(b).

The plaintiff's Complaint is similarly deficient with respect to allegations of causation of an injury and damages. The plaintiff alleges that as a result of the defendants "self-interestedly routing the Class members' orders . . . [he and potential class members] have been damaged." **See** Filing No. 75 - Amended Complaint ¶¶ 130-131. The plaintiff alleges he has "no adequate remedy at law." ***Id.*** ¶ 132. Nevertheless, the plaintiff alleges the defendants' actions apply to the members of the class "making class-wide monetary relief appropriate" and the class members "suffered damages to an extent within the peculiar knowledge of the Defendants." ***Id.*** ¶ 113. The plaintiff suggests that without redress, the defendants "will continue to retain their ill-gotten gains." ***Id.*** The plaintiff further argues the defendants' conduct damages him "to

the extent that such orders were, *inter alia*, not executed as quickly as they otherwise would have been, not filled to the extent they otherwise would have been, and denied opportunities for price improvement." **See** Filing No. 87 - Response p. 76.

In support of these allegations, the plaintiff alleges studies show analysis over a short time period indicate, for example, "orders resting on exchanges offering higher liquidity rebates filled slower and less often than similar orders on venues offering lower liquidity rebates." **See** Filing No. 75 - Amended Complaint ¶ 82.   Further, the researchers opined "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution." ***Id.*** ¶ 90.   Based on this information, the plaintiff alleges the defendants' "self-interested order routing, [resulted in their] fail[ure] to provide best execution . . . , causing . . . material harm in the form of economic loss due to [clients'] orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution." ***Id.*** ¶ 13. Additionally, the plaintiff contends the defendants' routing practices "expose" their clients' orders to disadvantageous sophisticated trader conduct.   **See** Filing No. 87 - Response p. 43 n.6.   The plaintiff argues his allegations based on "universally applicable findings" provide sufficient detail to sustain his pleading burden. ***Id.*** at 43. Specifically, the plaintiff states:

> Because these studies produced results that are universally true of the many venues in the fragmented market structure in which TD Ameritrade routes orders, it is quite clear both how and why TD Ameritrade's practice of routing orders to the markets which paid them the most was inconsistent with its duty of best execution.

***Id.*** at 43-44 (footnote omitted).

However, the plaintiff relies on allegations about taker fees having a negative impact on orders, generally, as supported by academic research. ***Id.*** The plaintiff gives examples of the concept under circumstances where all other factors being equal a high taker fee decreases the attractiveness of the orders. ***Id.*** Nevertheless, the plaintiff fails to show how, in practice, for either himself or the proposed class, orders suffered relative to comparable orders in other market centers.  In fact, the plaintiff fails to allege the defendants routed his orders in derogation of their duty or that he or the class suffered more than a theoretical risk of injury.  The plaintiff admits receipt of order flow

16

payments is not necessarily inconsistent with seeking best execution. **Id.** at 45 n.8.  For these reasons, the plaintiff fails to show the defendants acted with less than reasonable diligence to obtain the best execution of any order in exchange for the commissions paid.

"The principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he or she would have been had there been no injury or breach of duty, that is, to compensate for the injury **actually sustained**." **J.D. Warehouse v. Lutz & Co.**, 639 N.W.2d 88 (Neb. 2002) (emphasis added).  In Nebraska, the plaintiff has the initial burden of offering evidence sufficient to prove damages.  **See Bedore v. Ranch Oil Co.**, 805 N.W.2d 68, 86 (Neb. 2011).  "Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural."  **Sack Bros. v. Great Plains Co-op., Inc.**, 616 N.W.2d 796, 809 (Neb. 2000).  "Damages which are uncertain, speculative, or conjectural cannot be a basis for recovery."  **Hitzemann v. Adam**, 518 N.W.2d 102, 107 (Neb. 1994); **see American Cent. City, Inc. v. Joint Antelope Valley Auth.**, 807 N.W.2d 170, 181 (Neb. 2011).  "Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery."  **Sack Bros.**, 616 N.W.2d at 809; **see Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.**, 799 N.W.2d 249, 259 (Neb. 2011).  Proof of damages "is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness."  **Pribil v. Koinzan**, 665 N.W.2d 567, 572 (Neb. 2003); **see Lesiak v. Central Valley Ag Co-op., Inc.**, 808 N.W.2d 67, 76-77 (Neb. 2012) ("requir[ing] enough evidence to provide a reasonable basis for the jury to estimate the extent of the damage"); **Gary's Implement**, 799 N.W.2d at 259 (An injured party will not be precluded from recovering because an exact computation is difficult.).

Generally, a party "cannot recover damages merely for an 'increased risk' of harm."  **Tillman v. C.R. Bard, Inc.**, No. 3:13CV222, 2015 WL 1456657, at *35 (M.D. Fla. Mar. 30, 2015) (noting jury could conclude medical device malfunction exposes patient to a real calculable risk of life-threatening harm); **see Harms v. Laboratory Corp. of Am.**, 155 F. Supp. 2d 891, 912 (N.D. Ill. 2001) (granting summary judgment as to the plaintiffs' claim for "damages for risk of future harm" because "it is impossible to

17

determine without speculation what sort of injury—if any—[would occur]").  The plaintiff does not allege he is subject to future harm, rather the plaintiff argues he was subject to past risk of harm without any suggestion of a cognizable injury actually sustained.  **See** Filing No. 75 - Amended Complaint.  In any event, "the increased risk [of injury] must be based on evidence and not speculation, and, more importantly, the size of the award must reflect the probability of occurrence."  ***Dillon v. Evanston Hosp.***,771 N.E.2d 357, 371 (Ill. 2002) (noting future risk of injury as an element of damages).

In this case, the plaintiff suggests a zero probability of occurrence, since no actual injury is alleged despite the time period encompassing the risk of harm having preceded this lawsuit.  **See** *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The record is devoid of conflicting evidence or even allegations supporting the plaintiff's ability to prove the existence and likelihood of damages in the form of "negatively impact[ing], among other things, [their] clients' chances for price improvement," compromising efficiency and liquidity, and undefined "harmful impact"  **See, e.g.,** Filing No. 75 - Amended Complaint ¶¶ 92, 102, and 138.  Similarly, the plaintiff alleges he was damaged because he and proposed class members did not receive the best execution on their trades, yet fails to suggest any tangible economic harm occurred.  **See** *id.* ¶¶ 113 and 131.

At this stage in the proceedings, although the plaintiff is not required to come forward with evidence to support the allegations, the plaintiff must set forth a plausible claim for relief.  The plaintiff has not done that here.  The relevant case law does not support the plaintiff's claims individually or for class treatment.  Moreover, in evaluating whether a plaintiff has suffered an ascertainable loss, the court may not rely on "hypothetical or illusory" losses or wholly subjective expectations of a potential risk with unrealized harm.  This is particularly true, where, as here, the express terms of the regulation permits the defendants to consider and receive order flow payments.

### 2.      Securities Exchange Act of 1934

The defendants move to dismiss the 1934 Act claims arguing the plaintiff failed to allege facts for a Section 10(b) claim (Claim I) with the particularity required by the

Private Securities Litigation Reform Act of 1995 (PSLRA) and the Section 20(a) claim (Claim II) against Tomczyk fails as wholly derivative of the Section 10(b) claim.  **See** Filing No. 79 - Motion p. 1-2.  The plaintiff argues he has "pled particularized facts showing the Defendants' promise to provide best execution was both a misrepresentation and a fraud, because Defendants knew that their order routing practice would deny their clients price improvement opportunities, among other things, but nevertheless adopted the practice to boost their own bottom line."  **See** Filing No. 87 - Response p. 37-38.

A plaintiff states claims under Section 10(b) and Rule 10b-5 when he alleges: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss."  ***Horizon Asset Mgmt. v. H&R Block, Inc.***, 580 F.3d 755, 760 (8th Cir. 2009) (**quoting *Dura Pharms., Inc. v. Broudo***, 544 U.S. 336, 341-42 (2005)); **see also *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.***, 641 F.3d 1023, 1028 (8th Cir. 2011).

The plaintiff's Complaint alleges the defendants are liable under the above theories based on the defendants' representations they route trade orders after consideration of a variety of factors in compliance with their duty of best execution, but instead routed orders based on the single factor to obtain the highest order flow payments and liquidity rebates.  **See** Filing No. 75 - Amended Complaint p. 42-47.  As further expanded above, the plaintiff's allegations, taken as true, support an inference the defendants considered order flow payments when routing orders.  However, the plaintiff's allegations provide no reasonable or plausible inferences about whether the defendants relied upon or neglected any other factor.  Accordingly, the plaintiff's claim the defendants made a false representation or omission by failing to consider a wide variety of factors in order routing decisions is unsupported by well-pled factual allegations sufficient to avoid dismissal.  For this reason, the court need not address the remaining elements of each of these claims.  Nevertheless, the court finds the plaintiff fails to plausibly support a claim for damages.

The 1934 Act claims require the plaintiff plead he suffered damage as a result of the defendants' conduct.  Specifically, the plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  **Dura Pharms.**, 544 U.S. at 347.  Otherwise, "allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid."  **Id.**  The Complaint alleges Tomczyk "participated in the wrongful conduct alleged herein, which brought hundreds of millions of dollars of revenue to the Company at the expense of its clients."  **See** Filing No. 75 - Amended Complaint ¶ 126 (Count II).  The plaintiff also alleges, "[a]s a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with Defendants' routing of their orders during the Class Period."  **Id.** ¶ 122 (Count I).  Additionally, the plaintiff argues he alleges the amount per share the defendants realized in payments for order flow and liquidity rebates approximating $1 billion, in total received for alleged violations of the duty of best execution.  **See** Filing No. 87 - Response p. 59-60 (**citing** Filing No. 75 - Amended Complaint ¶¶ 11-12, 54).  Then the plaintiff argues:  "The specific amounts realized on retail orders are within the peculiar knowledge of the Defendants. Once discovery is completed and experts retained, Plaintiffs will no doubt be able to present the Court with very specific losses that TD Ameritrade customers incurred as a result of inferior execution practices."  **Id.** at 60.  Nevertheless, the plaintiff admits "on certain trades it is possible for a broker to receive these payments and still satisfy its duty to its clients.  [The defendants'] receipt of order routing payments thus does not constitute a per se violation of its duty."  **Id.** at 11; **see also id.** at 48.  These broad generalizations aside, the plaintiff fails to allege actual economic harm, as discussed in more detail above.  **See Iqbal**, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Instead, the plaintiff alleges elsewhere in the Complaint that he and the class members were damaged "as a result of [the defendants'] self-interested order routing, [they] failed to provide best execution for [their] clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution."  **See** Filing

20

No. 75 - Amended Complaint ¶ 13.  Additionally, the plaintiff contends the defendants' routing practices "expose" their clients' orders to disadvantageous sophisticated trader conduct.  **See** Filing No. 87 - Response p. 43 n.6.  The plaintiff further explains he was damaged by the defendants' conduct "to the extent that such orders were, *inter alia*, not executed as quickly as they otherwise would have been, not filled to the extent they otherwise would have been, and denied opportunities for price improvement."  **See** Filing No. 87 - Response p. 76.  The record is devoid of conflicting evidence or even allegations supporting the plaintiff's ability to prove the existence and likelihood of damages in the form of exposure to disadvantageous sophisticated trader conduct, denial of opportunities, or "lost value."  Similarly, the plaintiff alleges he was damaged because he did not receive the best execution on his trades, but rather than suggest an actual economic harm occurred to him or others, he notes the defendants' profit.  **See** *id.* ¶¶ 11-12, 54, 126.  Therefore, the defendants' motion should be granted as to the 1934 Act claims based on the plaintiff's failure to sufficiently allege a material misrepresentation and some indication of loss.

### 3.    Nebraska's Uniform Deceptive Trade Practices Act

The defendants contend the plaintiff's UDTPA claim fails for three reasons.  **See** Filing No. 80 - Brief p. 72.  The defendants argue the UDTPA does not apply to securities transactions and does not provide a private right of action for damages.  **See** *id.* at 72-76.  Additionally, the defendants assert the plaintiff failed to adequately plead a misrepresentation.  *Id.* at 72, 76.

#### i.    Does UDTPA apply to securities transactions?

The defendant argues the UDTPA does not apply to conduct regulated by federal regulators.  *Id.* at 72-73.  The UDTPA explicitly excludes:  "Conduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency. . . ."  Neb. Rev. Stat. § 87-304.  Although not resolved by Nebraska courts, courts outside this jurisdiction have relied on similar statutory language to exclude securities transactions from the purview of state unfair business and trade practices acts.  **See *Taylor v. Bear Stearns & Co.***, 572 F. Supp. 667, 674-75

(N.D. Ga. 1983).  In fact, "[t]he majority of jurisdictions that have confronted the question whether their unfair trade practices act applies to securities transactions have held that securities transactions are not covered under the state's unfair trade practices act." ***Wyman v. Prime Disc. Sec.***, 819 F. Supp. 79, 87 n.14 (D. Me. 1993) (collecting cases). The plaintiff does not dispute the exclusion would apply to securities transactions.  **See** Filing No. 87 - Response p. 76-78.  Rather, the plaintiff contends his claim survives because, he argues, again, the conduct complained of accrued prior to when any securities transactions took place.  *Id.* at 77-79.  As discussed above, the court finds the plaintiff's claims, including the claim asserted pursuant to the UDTPA, concern the best execution of the trades by routing the orders based on payment for order flow.  Thus the claims coincide with the purchase or sale of covered securities.   The defendants' conduct and practices in this regard are, therefore, excluded from coverage under the UDTPA and the plaintiff's claim should be dismissed.

### ii.    Did the plaintiff plead UDTPA damages?

The defendants also argue the damages sought by the plaintiff are unavailable under the UDTPA, requiring dismissal of the claims.  **See** Filing No. 80 - Brief p. 74-76. In particular, the defendants deny the plaintiff may receive money damages or any remedy for past harm.   *Id.*   The plaintiff contends equitable relief in the form of restitution and an injunction protecting against future harm are properly plead.  **See** Filing No. 87 - Response p. 79-82.  The UDTPA does not require proof of monetary damage because the type of damages available is limited:

> A person likely to be damaged by a deceptive trade practice of another may bring an action for, and the court may grant, an injunction under the principles of equity against the person committing the deceptive trade practice.  The court may order such additional equitable relief as it deems necessary to protect the public from further violations, including temporary and permanent injunctive relief.

Neb. Rev. Stat. § 87-303(a).

The Complaint seeks damages as set forth in its prayer for relief section:

> A.    Awarding damages against the Defendants in favor of the Class as a result of Defendants' breaches of fiduciary

duties, plus pre-judgment and post-judgment interest thereon;

B.     Directing TD Ameritrade to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its clients from recurrences of the damaging events described herein;

C.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiffs' attorneys, experts, and accountants; and

D.     Granting Plaintiffs such other and further relief as the Court may deem just and proper under the circumstances.

**See** Filing No. 75 - Amended Complaint p. 49-50.  Additionally, in the section under the heading "Class Definition and Allegations," the plaintiff alleges "[t]his action involves common questions of law and fact, which include, but are not limited to, the following: . . . Whether Plaintiffs and the Class are entitled to injunctive relief, restitution, or other equitable relief and/or other relief as may be proper."  *Id.* ¶ 109.  The plaintiff also notes, without explanation, "[t]he UDTPA provides for, and Plaintiffs seek to recover, restitution from Defendants."  **See** Filing No. 87 - Response p. 79.

The word "restitution" appears once in the plaintiff's 52-page Complaint and once in the plaintiff's 84-page brief, both quoted above.  The plaintiff provides no description or suggestion by what would constitute restitution in this matter.   The Complaint describes the "fee commissions" paid by the defendants' clients for each trade and routing revenue earned by the defendants in the form of liquidity rebates and payments for order flow.  **See** Filing No. 75 - Amended Complaint ¶ 58.  The plaintiff suggests the net revenue was derived at the clients' expense despite the clients paying "significant commissions for trades based on a best execution service never received.  **See** Filing No. 87 - Response p. 10, 20.  Nevertheless, the plaintiff fails to propose a method of restitution or defend how either a return of fee commissions or a portion of the defendants' revenue would be available under the UDTPA's damage limitation.  Although the restitution damages are insufficient, the court finds the injunctive relief sought may be sufficient to survive the defendants' motion for summary judgment.

iii.     Did the plaintiff adequately plead a UDTPA claim?

The defendants argue the plaintiff's UDTPA claim fails on the merits for the same reason the plaintiff's other claims fail:   the plaintiff fails to allege sufficient facts to support an allegation the defendants misrepresented they route client orders in accordance with best execution practices.   **See** Filing No. 80 - Brief p. 76.   Specifically, "to establish a violation of the UDTPA, there must have been a representation regarding the nature of goods or services and the representation must have been for characteristics or benefits that the goods or services did not have."   ***Nebraska ex rel. Stenberg v. Consumer's Choice Foods, Inc.***, 755 N.W.2d 583, 592 (Neb. 2008).

As determined above, the Complaint lacks factual support alleging the defendants failed to use reasonable diligence in determining best execution.   The Complaint insufficiently asserts a plausible claim by relying solely on the alleged fact the defendants routed virtually all orders to a pre-determined venue based on the amount of the rebate.   The contention the defendants routed "virtually" all orders to venues paying for order flow does not plausibly support an assumption the defendants failed to consider any factor other than payment for order flow.   The plaintiff's allegations are factually insufficient to support the inference the defendants neglected to consider any of the other factors required by the duty of best execution.   Accordingly, the plaintiff's claim the defendants misrepresented the characteristics of their services is unsupported by well-pled factual allegations sufficient to avoid dismissal without regard to whether the standard is Rule 8(a) or Rule 9(b).   For these reasons,

**IT IS RECOMMENDED TO SENIOR JUDGE JOSEPH F. BATAILLON that:**

The defendants' Motion to Dismiss Putative Amended Class Action Complaint and Request to Take Judicial Notice (Filing No. 79) be granted as set forth above.

**ADMONITION**

Pursuant to NECivR 72.2 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Report and Recommendation.   Failure to timely object may constitute a waiver of any objection.   The brief in support of any objection shall be filed at the time of

filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

**THE PARTIES ARE FURTHER ADMONISHED:  For this matter the court is imposing page limitations and other specifications.**  The plaintiff and the defendant each may not exceed 25 pages for briefs in support of (inclusive of any reply brief) or opposition to any objection pursuant to NECivR 72.2.  The page limit includes optional use of a table of contents and authorities.  All margins shall be one-inch on sides, top, and bottom.  The page limit excludes the case caption and notice of service, which should exceed no more than one-half page at the beginning and end of the brief, respectively.  Each page of a brief shall contain double-spaced text and single spaced footnotes.  Typeface text shall be in 12-point Arial font.   Footnote text may use 10-point font.

Dated this 23rd day of October, 2015.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge